HOLMES *v.* SECURITIES INVESTOR PROTECTION
CORPORATION ET AL.

No. 90–727.   Argued November 13, 1991—Decided March 24, 1992

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, KENNEDY, and THOMAS, JJ., joined, and in all but Part IV of which WHITE, STEVENS, and O'CONNOR, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which WHITE and STEVENS, JJ., joined, *post*, p. 276. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 286.

*Jack I. Samet* argued the cause for petitioner. With him on the briefs were *Jovina R. Hargis* and *Stephen K. Lubega.*

*G. Robert Blakey* argued the cause for respondents. With him on the brief for respondent Securities Investor Protection Corporation were *Stephen C. Taylor, Mark Riera, Theodore H. Focht,* and *Kevin H. Bell.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Institute of Certified Public Accountants by *Louis A. Craco* and *John J. Halloran, Jr.;* and for Arthur Andersen & Co. et al. by *Kathryn A. Oberly, Carl D. Liggio, Jon N. Ekdahl, Harris J. Amhowitz, Howard J. Krongard, Leonard P. Novello,* and *Eldon Olson.*

*Kevin P. Roddy* and *William S. Lerach* filed a brief for the National Association of Securities and Commercial Law Attorneys (NASCAT) as *amicus curiae* urging affirmance.

JUSTICE SOUTER delivered the opinion of the Court.

Respondent Securities Investor Protection Corporation (SIPC) alleges that petitioner Robert G. Holmes, Jr., conspired in a stock-manipulation scheme that disabled two broker-dealers from meeting obligations to customers, thus triggering SIPC's statutory duty to advance funds to reimburse the customers. The issue is whether SIPC can recover from Holmes under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §§ 1961–1968 (1988 ed. and Supp. II). We hold that it cannot.

## I

## A

The Securities Investor Protection Act of 1970 (SIPA), 84 Stat. 1636, as amended, 15 U. S. C. §§ 78aaa–78lll, authorized the formation of SIPC, a private nonprofit corporation, § 78ccc(a)(1), of which most broker-dealers registered under § 15(b) of the Securities Exchange Act of 1934, § 78o(b), are required to be "members," § 78ccc(a)(2)(A). Whenever SIPC determines that a member "has failed or is in danger of failing to meet its obligations to customers," and finds certain other statutory conditions satisfied, it may ask for a "protective decree" in federal district court. § 78eee(a)(3). Once a court finds grounds for granting such a petition, § 78eee(b)(1), it must appoint a trustee charged with liquidating the member's business, § 78eee(b)(3).

After returning all securities registered in specific customers' names, §§ 78fff–2(c)(2); 78fff(a)(1)(A); 78lll(3), the trustee must pool securities not so registered together with cash found in customers' accounts and divide this pool ratably to satisfy customers' claims, §§ 78fff–2(b); 78fff(a)(1)(B).[1] To

---

[1] Such "customer property," see 15 U. S. C. § 78lll(4), does not become part of the debtor's general estate until all customers' and SIPC's claims have been paid. See § 78fff–2(c)(1). That is to say, the claim of a general

the extent the pool of customer property is inadequate, SIPC must advance up to \$500,000 per customer[2] to the trustee for use in satisfying those claims. § 78fff–3(a).[3]

### B

On July 24, 1981, SIPC sought a decree from the United States District Court for the Southern District of Florida to protect the customers of First State Securities Corporation (FSSC), a broker-dealer and SIPC member. Three days later, it petitioned the United States District Court for the Central District of California, seeking to protect the customers of Joseph Sebag, Inc. (Sebag), also a broker-dealer and SIPC member. Each court issued the requested decree and appointed a trustee, who proceeded to liquidate the broker-dealer.

Two years later, SIPC and the two trustees brought this suit in the United States District Court for the Central District of California, accusing some 75 defendants of conspiracy in a fraudulent scheme leading to the demise of FSSC and Sebag. Insofar as they are relevant here, the allegations were that, from 1964 through July 1981, the defendants manipulated stock of six companies by making unduly optimistic statements about their prospects and by continually selling small numbers of shares to create the appearance of a liquid market; that the broker-dealers bought substantial amounts of the stock with their own funds; that the market's perception of the fraud in July 1981 sent the stocks plummeting;

---

creditor of the broker-dealer (say, its landlord) is subordinated to claims of customers and SIPC.

[2] With respect to a customer's cash on deposit with the broker-dealer, SIPC is not obligated to advance more than \$100,000 per customer. § 78fff–3(a)(1).

[3] To cover these advances, SIPA provides for the establishment of a SIPC Fund. § 78ddd(a)(1). SIPC may replenish the fund from time to time by levying assessments, § 78ddd(c)(2), which members are legally obligated to pay, § 78jjj(a).

and that this decline caused the broker-dealers' financial difficulties resulting in their eventual liquidation and SIPC's advance of nearly $13 million to cover their customers' claims. The complaint described Holmes' participation in the scheme by alleging that he made false statements about the prospects of one of the six companies, Aero Systems, Inc., of which he was an officer, director, and major shareholder; and that over an extended period he sold small amounts of stock in one of the other six companies, the Bunnington Corporation, to simulate a liquid market. The conspirators were said to have violated § 10(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j(b), Securities and Exchange Commission (SEC) Rule 10b–5, 17 CFR § 240.10b–5 (1991), and the mail and wire fraud statutes, 18 U. S. C. §§ 1341, 1343 (1988 ed., Supp. II). Finally, the complaint concluded that their acts amounted to a "pattern of racketeering activity" within the meaning of the RICO statute, 18 U. S. C. §§ 1962, 1961(1), and (5) (1988 ed. and Supp. II), so as to entitle the plaintiffs to recover treble damages, § 1964(c).

After some five years of litigation over other issues,[4] the District Court entered summary judgment for Holmes on the RICO claims, ruling that SIPC "does not meet the 'purchaser-seller' requirements for standing to assert RICO claims which are predicated upon violation of Section 10(b) and Rule 10b–5," App. to Pet. for Cert. 45a,[5] and that neither

---

[4] See generally *Securities Investor Protection Corporation* v. *Vigman*, 803 F. 2d 1513 (CA9 1986) *(Vigman II); Securities Investor Protection Corporation* v. *Vigman*, 764 F. 2d 1309 (CA9 1985) *(Vigman I)*.

[5] Two years earlier, the District Court had dismissed SIPC's non-RICO securities action on the ground that SIPC's claim to have been subrogated to the rights only of those customers who did not purchase any of the manipulated securities rendered the action a failure under the so-called *Birnbaum* test, which requires a plaintiff to be a purchaser or seller of a security. See *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975); *Birnbaum* v. *Newport Steel Corp.*, 193 F. 2d 461 (CA2), cert. denied, 343 U. S. 956 (1952). The Court of Appeals for the Ninth Circuit reversed

SIPC nor the trustees had satisfied the "proximate cause requirement under RICO," *id.*, at 39a; see *id.*, at 37a. Although SIPC's claims against many other defendants remained pending, the District Court under Federal Rule of Civil Procedure 54(b) entered a partial judgment for Holmes, immediately appealable. SIPC and the trustees appealed.

The United States Court of Appeals for the Ninth Circuit reversed and remanded after rejecting both of the District Court's grounds. *Securities Investor Protection Corporation* v. *Vigman*, 908 F. 2d 1461 (1990). The Court of Appeals held first that, whereas a purchase or sale of a security is necessary for entitlement to sue on the implied right of action recognized under § 10(b) and Rule 10b–5, see *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975), the cause of action expressly provided by § 1964(c) of RICO imposes no such requirement limiting SIPC's standing, 908 F. 2d, at 1465–1467. Second, the appeals court held the finding of no proximate cause to be error, the result of a mistaken focus on the causal relation between SIPC's injury and the acts of Holmes alone; since Holmes could be held responsible for the acts of all his co-conspirators, the Court of Appeals explained, the District Court should have looked to the causal relation between SIPC's injury and the acts of all conspirators. *Id.*, at 1467–1469.[6]

Holmes' ensuing petition to this Court for certiorari presented two issues, whether SIPC had a right to sue under

that ruling, *Vigman II, supra,* holding that the District Court should have permitted SIPC to proceed under the *Birnbaum* rule to the extent that FSSC and Sebag had made unauthorized use of those customers' assets to buy manipulated securities, as SIPC had alleged they had. *Id.*, at 1519–1520. On remand, after discovery, the District Court ruled that no genuine issue of material fact existed on the question of unauthorized use and that Holmes was entitled to summary judgment. App. to Pet. for Cert. 27a. SIPC has not appealed that ruling.

[6] For purposes of this decision, we will assume without deciding that the Court of Appeals correctly held that Holmes can be held responsible for the acts of his co-conspirators.

RICO,[7] and whether Holmes could be held responsible for the actions of his co-conspirators. We granted the petition on the former issue alone, 499 U. S. 974 (1991), and now reverse.[8]

## II

## A

RICO's provision for civil actions reads that

> "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."  18 U. S. C. § 1964(c).

This language can, of course, be read to mean that a plaintiff is injured "by reason of" a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962,[9] the plaintiff was injured, and the defendant's viola-

---

[7] The petition phrased the question as follows: "Whether a party which was neither a purchaser nor a seller of securities, and for that reason lacked standing to sue under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder, is free of that limitation on standing when presenting essentially the same claims under the Racketeer Influenced and Corrupt Organizations Act ('RICO')."  Pet. for Cert. i.

[8] Holmes does not contest the trustees' right to sue under § 1964(c), and they took no part in the proceedings before this Court after we granted certiorari on the first question alone.

[9] Section 1962 lists "Prohibited activities."  Before this Court, SIPC invokes only subsections (c) and (d).  See Brief for Respondent 15, and n. 58. Subsection (c) makes it "unlawful for any person . . . associated with any enterprise . . . to . . . participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  Insofar as it is relevant here, subsection (d) makes it unlawful to conspire to violate subsection (c).  The RICO statute defines "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity[,] . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  § 1961(5).  The predicate offenses here at issue are listed in 18 U. S. C. §§ 1961(1)(B) and (D) (1988 ed., Supp. II), which

tion was a "but for" cause of plaintiff's injury. Cf. *Associated General Contractors of Cal., Inc.* v. *Carpenters,* 459 U. S. 519, 529 (1983). This construction is hardly compelled, however, and the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover[10] persuades us that RICO should not get such an expansive reading.[11] Not even SIPC seriously argues otherwise.[12]

---

define "racketeering activity" to include "any act which is indictable under . . . section 1341 (relating to mail fraud), [or] section 1343 (relating to wire fraud), . . . or . . . any offense involving . . . fraud in the sale of securities . . . ."

[10] "In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.'" W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984) (quoting *North* v. *Johnson,* 58 Minn. 242, 245, 59 N. W. 1012 (1894)). As we put it in the antitrust context, "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 [of the Clayton Act, 15 U. S. C. § 15,] there is a point beyond which the wrongdoer should not be held liable." *Blue Shield of Virginia* v. *McCready,* 457 U. S. 465, 476–477 (1982) (internal quotation marks and citation omitted).

[11] The Courts of Appeals have overwhelmingly held that not mere factual, but proximate, causation is required. See, *e. g., Pelletier* v. *Zweifel,* 921 F. 2d 1465, 1499–1500 (CA11), cert. denied, 502 U. S. 855 (1991); *Ocean Energy II, Inc.* v. *Alexander & Alexander, Inc.,* 868 F. 2d 740, 744 (CA5 1989); *Brandenburg* v. *Seidel,* 859 F. 2d 1179, 1189 (CA4 1988); *Sperber* v. *Boesky,* 849 F. 2d 60 (CA2 1988); *Haroco, Inc.* v. *American National Bank & Trust Co. of Chicago,* 747 F. 2d 384, 398 (CA7 1984), aff'd, 473 U. S. 606 (1985) *(per curiam).* Indeed, the court below recognized a proximate-cause requirement. See *Securities Investor Protection Corporation* v. *Vigman,* 908 F. 2d 1461, 1468 (CA9 1990).

[12] SIPC does say that the question whether its claim must, and as alleged may, satisfy the standard of proximate causation is not within the question on which we granted certiorari. See Brief for Respondent 3, 33, 34, 38–39. However, the proximate-cause issue is "fairly included" within that question. See this Court's Rule 14.1(a). SIPC's own restatement of the question presented reads: "Was the Ninth Circuit correct when it held that SIPC need not be a 'purchaser or seller' of securities to sue under Section 1964(c), which provides that 'any person' may sue for 'injury to

The key to the better interpretation lies in some statutory history. We have repeatedly observed, see *Agency Holding Corp.* v. *Malley-Duff & Associates, Inc.*, 483 U. S. 143, 150–151 (1987); *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 241 (1987); *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 489 (1985), that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act, which reads in relevant part that

> "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. § 15.

In *Associated General Contractors, supra,* we discussed how Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act, passed 24 years earlier.[13] Before 1914, lower federal courts had read § 7 to incorporate common-law principles of proximate causation, 459 U. S., at 533–534, and n. 29 (citing *Loeb* v. *Eastman Kodak Co.*, 183 F. 704 (CA3 1910); *Ames* v. *American Telephone & Telegraph Co.*, 166 F. 820 (CC Mass. 1909)), and we reasoned, as many lower federal courts had done before us, see *Associated Gen-*

---

his business or property' 'by reason of' 'any offense . . . involving fraud in the sale of securities . . . punishable under any law of the United States,' wire fraud, or mail fraud in violation of Section 1962?" Brief for Respondent i (ellipses in original). By thus restating the question presented (as was its right to do, see this Court's Rule 24.2), SIPC properly set the enquiry in the key of the language of § 1964(c), which we hold today carries a proximate-cause requirement within it. What is more, SIPC briefed the proximate-cause issue, see Brief for Respondent 34–36, 38–39, and announced at oral argument that it recognized the Court might reach it, see Tr. of Oral Arg. 31.

[13] When Congress enacted § 4 of the Clayton Act, § 7 of the Sherman Act read in relevant part:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue . . . ." 26 Stat. 210.

*eral Contractors, supra,* at 536, n. 33 (citing cases),[14] that congressional use of the § 7 language in § 4 presumably carried the intention to adopt "the judicial gloss that avoided a simple literal interpretation," 459 U. S., at 534. Thus, we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well.

The reasoning applies just as readily to § 1964(c). We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. See *Cannon* v. *University of Chicago,* 441 U. S. 677, 696–698 (1979). It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them. See, *e. g., Oscar Mayer & Co.* v. *Evans,* 441 U. S. 750, 756 (1979); *Northcross* v. *Memphis Bd. of Ed.,* 412 U. S. 427, 428 (1973). Proximate cause is thus required.

## B

Here we use "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984). Accordingly, among the many shapes this concept took at common law, see *Associated General Contractors, supra,* at 532–533, was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to

---

[14] These lower courts had so held well before 1970, when Congress passed RICO.

recover. See, *e. g.*, 1 J. Sutherland, Law of Damages 55–56 (1882).

Although such directness of relationship is not the sole requirement of Clayton Act causation,[15] it has been one of its central elements, *Associated General Contractors*, 459 U. S., at 540, for a variety of reasons. First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. *Id.*, at 542–543. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. *Id.*, at 543–544; *Blue Shield of Virginia* v. *McCready*, 457 U. S. 465, 473–475 (1982); *Hawaii* v. *Standard Oil Co. of Cal.*, 405 U. S. 251, 264 (1972). And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as

---

[15] We have sometimes discussed the requirement that a § 4 plaintiff have suffered "antitrust injury" as a component of the proximate-cause enquiry. See *Associated General Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519, 538 (1983); *Blue Shield of Virginia* v. *McCready*, 457 U. S., at 481–484. We need not discuss it here, however, since "antitrust injury" has no analogue in the RICO setting. See *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 495–497 (1985).

For the same reason, there is no merit in SIPC's reliance on legislative history to the effect that it would be inappropriate to have a "private litigant . . . contend with a body of precedent—appropriate in a purely antitrust context—setting strict requirements on questions such as 'standing to sue' and 'proximate cause.'" 115 Cong. Rec. 6995 (1969) (American Bar Association comments on S. 2048). That statement is rightly understood to refer only to the applicability of the concept of "antitrust injury" to RICO, which we rejected in *Sedima, supra*, at 495–497. See *Brandenburg* v. *Seidel*, 859 F. 2d, at 1189, n. 11. Besides, even if we were to read this statement to say what SIPC says it means, it would not amount to more than background noise drowned out by the statutory language.

private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely. *Associated General Contractors, supra,* at 541–542.

We will point out in Part III–A below that the facts of the instant case show how these reasons apply with equal force to suits under § 1964(c).

## III

As we understand SIPC's argument, it claims entitlement to recover, first, because it is subrogated to the rights of those customers of the broker-dealers who did not purchase manipulated securities, and, second, because a SIPA provision gives it an independent right to sue. The first claim fails because the conspirators' conduct did not proximately cause the nonpurchasing customers' injury, the second because the provision relied on gives SIPC no right to sue for damages.

### A

As a threshold matter, SIPC's theory of subrogation is fraught with unanswered questions. In suing Holmes, SIPC does not rest its claimed subrogation to the rights of the broker-dealers' customers on any provision of SIPA. See Brief for Respondent 38, and n. 181. SIPC assumes that SIPA provides for subrogation to the customers' claims against the failed broker-dealers, see 15 U. S. C. §§ 78fff–3(a), 78fff–4(c); see also § 78fff–2(c)(1)(C); see generally *Mishkin* v. *Peat, Marwick, Mitchell & Co.,* 744 F. Supp. 531, 556–557 (SDNY 1990), but not against third parties like Holmes. As against him, SIPC relies rather on "common law rights of subrogation" for what it describes as "its money paid to customers for customer claims against third parties." Brief for Respondent 38 (footnote omitted). At oral argument in this Court, SIPC narrowed its subrogation argument to cover only the rights of customers who never purchased manipu-

lated securities. Tr. of Oral Arg. 29.[16] But SIPC stops there, leaving us to guess at the nature of the "common law rights of subrogation" that it claims, and failing to tell us whether they derive from federal or state common law, or, if the latter, from common law of which State.[17] Nor does SIPC explain why it declines to assert the rights of customers who bought manipulated securities.[18]

It is not these questions, however, that stymie SIPC's subrogation claim, for even assuming, *arguendo*, that it may stand in the shoes of nonpurchasing customers, the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims. Although the customers' claims are senior (in recourse to "customer property") to those of the broker-dealers' general creditors, see § 78fff–2(c)(1), the causes of their respective injuries are the same: The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors.

As we said, however, in *Associated General Contractors*, quoting Justice Holmes, " 'The general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" 459 U. S., at 534 (quoting *Southern Pacific Co.* v.

[16] And, SIPC made no allegation that any of these customers failed to do so in reliance on acts or omissions of the conspirators.

[17] There is support for the proposition that SIPC can assert state-law subrogation rights against third parties. See *Redington* v. *Touche Ross & Co.*, 592 F. 2d 617, 624 (CA2 1978), rev'd on other grounds, 442 U. S. 560 (1979). We express no opinion on this issue.

[18] The record reveals that those customers have brought their own suit against the conspirators.

*Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 533 (1918)),[19] and the reasons that supported conforming Clayton Act causation to the general tendency apply just as readily to the present facts, underscoring the obvious congressional adoption of the Clayton Act direct-injury limitation among the requirements of § 1964(c).[20]   If the nonpurchasing customers were

---

[19] SIPC tries to avoid foundering on the rule that creditors generally may not sue for injury affecting their debtors' solvency by arguing that those customers that owned manipulated securities themselves were victims of Holmes' fraud.   See Brief for Respondent 39, n. 185 (citing *Ashland Oil, Inc.* v. *Arnett*, 875 F. 2d 1271, 1280 (CA7 1989); *Ocean Energy*, 868 F. 2d, at 744–747; *Bankers Trust Co.* v. *Rhoades*, 859 F. 2d 1096, 1100–1101 (CA2 1988), cert. denied, 490 U. S. 1007 (1989)).   While that may well be true, since SIPC does not claim subrogation to the rights of the customers that purchased manipulated securities, see *supra*, at 270–271, it gains nothing by the point.

We further note that SIPC alleged in the courts below that, in late May 1981, Joseph Lugo, an officer of FSSC and one of the alleged conspirators, parked manipulated stock in the accounts of customers, among them Holmes, who actively participated in the parking transaction involving his account.   See Statement of Background and Facts, 1 App. 223–225.   Lugo "sold" securities owned by FSSC to customers at market price and "bought" back the same securities some days later at the same price plus interest.   Under applicable regulations, a broker-dealer must discount the stock it holds in its own account, see 17 CFR § 240.15c3–1(c)(2)(iv)(F)(1)(vi) (1991), and the sham transactions allowed FSSC to avoid the discount. But for the parking transactions, FSSC would allegedly have failed capital requirements sooner; would have been shut down by regulators; and would not have dragged Sebag with it in its demise.   1 App. 231.   Thus, their customers would have been injured to a lesser extent.   *Id.*, at 229, 231. We do not rule out that, if, by engaging in the parking transactions, the conspirators committed mail fraud, wire fraud, or "fraud in the sale of securities," see 18 U. S. C. §§ 1961(1)(B) and (D) (1988 ed., Supp. I), the broker-dealers' customers might be proximately injured by these offenses. See, *e. g.*, *Taffet* v. *Southern Co.*, 930 F. 2d 847, 856–857 (CA11 1991); *County of Suffolk* v. *Long Island Lighting Co.*, 907 F. 2d 1295, 1311–1312 (CA2 1990).   However this may be, SIPC in its brief on the merits places exclusive reliance on a manipulation theory and is completely silent about the alleged parking scheme.

[20] As we said in *Associated General Contractors*, "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case."   459 U. S., at 536

allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets. Assuming that an appropriate assessment of factual causation could be made out, the district court would then have to find some way to apportion the possible respective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages. Finally, the law would be shouldering these difficulties despite the fact that those directly injured, the broker-dealers, could be counted on to bring suit for the law's vindication. As noted above, the broker-dealers have in fact sued in this case, in the persons of their SIPA trustees appointed on account of their insolvency.[21]

---

(footnote omitted). Thus, our use of the term "direct" should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text. We do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached. See, e. g., Sedima, 473 U. S., at 497, n. 15; id., at 522 (Marshall, J., dissenting); Pelletier, 921 F. 2d, at 1499–1500; Ocean Energy, supra.

[21] If the trustees had not brought suit, SIPC likely could have forced their hands. To the extent consistent with SIPA, bankruptcy principles apply to liquidations under that statute. See § 78fff(b); see also § 78fff-1(b) (to extent consistent with SIPA, SIPA trustee has same duties as trustee under Chapter 7 of Bankruptcy Code); § 78eee(b)(2)(A)(iii) (to extent consistent with SIPA, court supervising SIPA liquidation has same powers and duties as bankruptcy court). And, it is generally held that a creditor can, by petitioning the bankruptcy court for an order to that effect, compel the trustee to institute suit against a third party. See In re Automated Business Systems, Inc., 642 F. 2d 200, 201 (CA6 1981). As a practical matter, it is very unlikely that SIPC will have to petition a court for such an order, given its influence over SIPA trustees. See § 78eee(b)(3) (court must appoint as trustee "such perso[n] as SIPC, in its sole discretion, specifies," which in certain circumstances may be SIPC itself); § 78eee(b)(5)(C) (SIPC's recommendation to court on trustee's compensation is entitled to "considerable reliance" and is, under certain circumstances, binding).

Indeed, the insolvency of the victim directly injured adds a further concern to those already expressed, since a suit by an indirectly injured victim could be an attempt to circumvent the relative priority its claim would have in the directly injured victim's liquidation proceedings. See *Mid-State Fertilizer Co.* v. *Exchange National Bank of Chicago,* 877 F. 2d 1333, 1336 (CA7 1989).

As against the force of these considerations of history and policy, SIPC's reliance on the congressional admonition that RICO be "liberally construed to effectuate its remedial purposes," § 904(a), 84 Stat. 947, does not deflect our analysis. There is, for that matter, nothing illiberal in our construction: We hold not that RICO cannot serve to right the conspirators' wrongs, but merely that the nonpurchasing customers, or SIPC in their stead, are not proper plaintiffs. Indeed, we fear that RICO's remedial purposes would more probably be hobbled than helped by SIPC's version of liberal construction: Allowing suits by those injured only indirectly would open the door to "massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits." *Associated General Contractors,* 459 U. S., at 545.

In sum, subrogation to the rights of the manipulation conspiracy's secondary victims does, and should, run afoul of proximate-causation standards, and SIPC must wait on the outcome of the trustees' suit. If they recover from Holmes, SIPC may share according to the priority SIPA gives its claim. See 15 U. S. C. § 78fff–2(c).

B

SIPC also claims a statutory entitlement to pursue Holmes for funds advanced to the trustees for administering the liquidation proceedings. See Tr. of Oral Arg. 30. Its theory here apparently is not one of subrogation, to which the statute makes no reference in connection with SIPC's obligation

to make such advances. See 15 U. S. C. § 78fff–3(b)(2).[22]
SIPC relies instead, see Brief for Respondent 37, and n. 180,
on this SIPA provision:

> "SIPC participation—SIPC shall be deemed to be a
> party in interest as to all matters arising in a liquidation
> proceeding, with the right to be heard on all such mat-
> ters, and shall be deemed to have intervened with re-
> spect to all such matters with the same force and effect
> as if a petition for such purpose had been allowed by the
> court." 15 U. S. C. § 78eee(d).

The language is inapposite to the issue here, however. On
its face, it simply qualifies SIPC as a proper party in interest
in any "matter arising in a liquidation proceeding" as to
which it "shall be deemed to have intervened." By extend-
ing a right to be heard in a "matter" pending between other
parties, however, the statute says nothing about the condi-
tions necessary for SIPC's recovery as a plaintiff. How the
provision could be read, either alone or with § 1964(c), to give
SIPC a right to sue Holmes for money damages simply
eludes us.

## IV

Petitioner urges us to go further and decide whether every
RICO plaintiff who sues under § 1964(c) and claims securities
fraud as a predicate offense must have purchased or sold a
security, an issue on which the Circuits appear divided.[23]
We decline to do so. Given what we have said in Parts II

---

[22] To the extent that SIPC's unexplained remark at oral argument, see
Tr. of Oral Arg. 29–30, could be understood to rest its claim for recovery
of these advances on a theory of subrogation, it came too late. One looks
in vain for any such argument in its brief.

[23] Compare 908 F. 2d, at 1465–1467 (no purchaser-seller rule under
RICO); *Warner* v. *Alexander Grant & Co.,* 828 F. 2d 1528, 1530 (CA11
1987) (same), with *International Data Bank, Ltd.* v. *Zepkin,* 812 F. 2d 149,
151–154 (CA4 1987) (RICO plaintiff relying on securities fraud as predicate
offense must have been purchaser or seller); *Brannan* v. *Eisenstein,* 804
F. 2d 1041, 1046 (CA8 1986) (same).

and III, our discussion of the issue would be unnecessary to the resolution of this case. Nor do we think that leaving this question unanswered will deprive the lower courts of much-needed guidance. A review of the conflicting cases shows that all could have been resolved on proximate-causation grounds, and that none involved litigants like those in *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975), persons who had decided to forgo securities transactions in reliance on misrepresentations. Thus, we think it inopportune to resolve the issue today.

## V

We hold that, because the alleged conspiracy to manipulate did not proximately cause the injury claimed, SIPC's allegations and the record before us fail to make out a right to sue petitioner under § 1964(c). We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE WHITE and JUSTICE STEVENS join, concurring in part and concurring in the judgment.

I agree with the Court that the civil action provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 84 Stat. 941, as amended, 18 U. S. C. §§ 1961–1968 (1988 ed. and Supp. II), have a proximate cause element, and I can even be persuaded that the proximate cause issue is "fairly included" in the question on which we granted certiorari. *Ante*, at 266, n. 12. In my view, however, before deciding whether the Securities Investor Protection Corporation (SIPC) was proximately injured by petitioner's alleged activities, we should first consider the standing question that was decided below, and briefed and argued here, and which was the only clearly articulated question on which we granted certiorari. In resolving that question, I would hold

that a plaintiff need not be a purchaser or a seller to assert RICO claims predicated on violations of fraud in the sale of securities.

Section 10(b) of the Securities Exchange Act of 1934 (1934 Act) makes it unlawful for any person to use, "in connection with the purchase or sale of any security," any "manipulative or deceptive device or contrivance" in contravention of rules or regulations that the Securities and Exchange Commission (SEC) may prescribe. 15 U. S. C. § 78j(b). Pursuant to its authority under § 10(b), the SEC has adopted Rule 10b–5, which prohibits manipulative or deceptive acts "in connection with the purchase or sale of any security." 17 CFR § 240.10b–5 (1991). In 1971, we ratified without discussion the "established" view that § 10(b) and Rule 10b–5 created an implied right of action. *Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co.*, 404 U. S. 6, 13, n. 9. Four years later, in *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975), we confirmed the federal courts' "longstanding acceptance"[1] of the rule that a plaintiff must have actually purchased or sold the securities at issue in order to bring a Rule 10b–5 private damages action. *Id.*, at 733.

In this case, the District Court held that SIPC, which was neither a purchaser nor a seller of the allegedly manipulated securities, lacked standing to assert RICO claims predicated on alleged violations of § 10(b) and Rule 10b–5. App. to Pet. for Cert. 45a. The Court of Appeals reversed and held that *Blue Chip Stamps*' purchaser/seller limitation does not apply to suits brought under RICO. *Securities Investment Protection Corp.* v. *Vigman*, 908 F. 2d 1461 (CA9 1990). An ex-

---

[1] That acceptance was not universal. *E. g., Eason* v. *General Motors Acceptance Corp.*, 490 F. 2d 654, 659 (CA7 1973) (holding that "the protection of [Rule 10b–5] extends to persons who, in their capacity as investors, suffer significant injury as a direct consequence of fraud in connection with a securities transaction, even though their participation in the transaction did not involve either the purchase or the sale of a security") (Stevens, J.).

amination of the text of RICO, and a comparison with the situation the Court confronted in *Blue Chip Stamps,* persuades me that the Court of Appeals' determination was correct. Because the Court's decision today leaves intact a division among the Circuits on whether *Blue Chip Stamps'* standing requirement applies in RICO suits,[2] I would affirm this portion of the decision below, even though we go on to hold that the alleged RICO violation did not proximately cause SIPC's injuries.

Our obvious starting point is the text of the statute under which SIPC sued. RICO makes it unlawful for any person who has engaged in a "pattern of racketeering activity" to invest, maintain an interest, or participate in an enterprise that is engaged in interstate or foreign commerce. 18 U. S. C. § 1962. "[R]acketeering activity" is defined to include a number of state and federal offenses, including any act indictable under 18 U. S. C. § 1341 (1988 ed., Supp. II) (mail fraud) or § 1343 (wire fraud), and "any offense involving . . . fraud in the sale of securities . . . punishable under any law of the United States." § 1961(1). RICO authorizes "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue for treble damages in federal court. § 1964(c).

RICO's civil suit provision, considered on its face, has no purchaser/seller standing requirement. The statute sweeps

---

[2] Compare *Securities Investment Protection Corp.* v. *Vigman,* 908 F. 2d 1461, 1465–1467 (CA9 1990) (purchaser/seller standing limitation does not apply to RICO claims predicated on acts of fraud in the sale of securities); *Warner* v. *Alexander Grant & Co.,* 828 F. 2d 1528, 1530 (CA11 1987) (same), with *International Data Bank, Ltd.* v. *Zepkin,* 812 F. 2d 149, 151–154 (CA4 1987) (standing to bring RICO action predicated on fraud in the sale of securities is limited to purchaser or seller of securities); *Brannan* v. *Eisenstein,* 804 F. 2d 1041, 1046 (CA8 1986) (same).

broadly, authorizing *"[a]ny* person" who is injured by reason of a RICO violation to sue. "[P]erson" is defined to include *"any* individual or entity capable of holding a legal or beneficial interest in property." § 1961(3) (emphasis added). "Insofar as 'any' encompasses 'all'," *Mobil Oil Exploration & Producing Southeast, Inc.* v. *United Distribution Cos.,* 498 U. S. 211, 223 (1991), the words "any person" cannot reasonably be read to mean only purchasers and sellers of securities. As we have explained in rejecting previous efforts to narrow the scope of civil RICO: "If the defendant engages in a pattern of racketeering activity in a manner forbidden by [§ 1962's] provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional . . . requirement." *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S. 479, 495 (1985).

Of course, a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation." *Id.,* at 496. We have already remarked that the requirement of injury in one's "business or property" limits the availability of RICO's civil remedies to those who have suffered injury in fact. *Id.,* at 497 (citing *Haroco, Inc.* v. *American National Bank & Trust Co. of Chicago,* 747 F. 2d 384, 398 (CA7 1984)). Today, the Court sensibly holds that the statutory words "by reason of" operate, as they do in the antitrust laws, to confine RICO's civil remedies to those whom the defendant has truly injured in some meaningful sense. Requiring a proximate relationship between the defendant's actions and the plaintiff's harm, however, cannot itself preclude a nonpurchaser or nonseller of securities, alleging predicate acts of fraud in the sale of securities, from bringing suit under § 1964(c). Although the words "injury in [one's] business or property" and "by reason of" are words of limitation, they do not categorically exclude non-

purchasers and nonsellers of securities from the universe of RICO plaintiffs.

Petitioner argues that the civil suit provisions of § 1964(c) are not as sweeping as they appear because § 1964(c) incorporates the standing requirements of the predicate acts alleged. But § 1964(c) focuses on the "injur[y]" of any "person," not the legal right to sue of any proper plaintiff for a predicate act. If standing were to be determined by reference to the predicate offenses, a private RICO plaintiff could not allege as predicates many of the acts that constitute the definition of racketeering activity. The great majority of acts listed in § 1961(1) are criminal offenses for which only a State or the Federal Government is the proper party to bring suit. In light of § 1964(c)'s provision that "any person" injured by reason of a RICO violation may sue, I would not accept that this same section envisions an overlay of standing requirements from the predicate acts, with the result that many RICO suits could be brought only by government entities.

Nor can I accept the contention that, even if § 1964(c) does not normally incorporate the standing requirements of the predicate acts, an exception should be made for "fraud in the sale of securities" simply because it is well established that a plaintiff in a civil action under § 10(b) and Rule 10b–5 must be either a purchaser or seller of securities. A careful reading of § 1961(1) reveals the flaw in this argument. The relevant predicate offense is "any offense involving . . . fraud in the sale of securities . . . punishable under any law of the United States." The embracing words "offense . . . punishable under any law of the United States" plainly signify the elements necessary to bring a criminal prosecution. See *Trane Co.* v. *O'Connor Securities,* 718 F. 2d 26, 29 (CA2 1983); *Dan River, Inc.* v. *Icahn,* 701 F. 2d 278, 291 (CA4 1983). To the extent that RICO's reference to an "offense involving fraud in the sale of securities" encompasses conduct that violates § 10(b), see *infra,* at 282–283, the relevant predicate is

defined not by § 10(b) itself, but rather by § 32(a) of the 1934 Act, 15 U. S. C. § 78ff(a), which authorizes criminal sanctions against any person who willfully violates the Act or rules promulgated thereunder. As we have previously made clear, the purchaser/seller standing requirement for private civil actions under § 10(b) and Rule 10b–5 is of no import in criminal prosecutions for willful violations of those provisions. *United States* v. *Naftalin,* 441 U. S. 768, 774, n. 6 (1979); *SEC* v. *National Securities, Inc.,* 393 U. S. 453, 467, n. 9 (1969). Thus, even if Congress intended RICO's civil suit provision to subsume established civil standing requirements for predicate offenses, that situation is not presented here.

Although the civil suit provisions of § 1964(c) lack a purchaser/seller requirement, it is still possible that one lurks in § 1961(1)'s catalog of predicate acts; *i. e.,* it is possible that § 1961(1) of its own force limits RICO standing to the actual parties to a sale. As noted above, the statute defines "racketeering activity" to include "any offense involving . . . fraud in the sale of securities . . . punishable under any law of the United States." Unfortunately, the term "fraud in the sale of securities" is not further defined. "[A]ny offense . . . punishable under any law of the United States" presumably means that Congress intended to refer to the federal securities laws and not common-law tort actions for fraud. Unlike most of the predicate offenses listed in § 1961(1), however, there is no cross-reference to any specific sections of the United States Code. Nor is resort to the legislative history helpful in clarifying what kinds of securities violations Congress contemplated would be covered. See generally Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities," 18 Ga. L. Rev. 43, 58–59 (1983) (discussing paucity of legislative history); Note, RICO and Securities Fraud: A Workable Limitation, 83 Colum. L. Rev. 1513, 1536–1539 (1983) (reviewing testimony before Senate Judiciary Committee).

Which violations of the federal securities laws, if any, constitute a "fraud in the sale of securities" within the meaning of § 1961(1) is a question that has generated much ink and little agreement among courts[3] or commentators,[4] and one

[3] Compare *First Pacific Bancorp, Inc. v. Bro*, 847 F. 2d 542, 546 (CA9 1988) (violations of §§ 13(d) and 14(e) of the 1934 Act cannot be RICO predicate offenses because neither provision embraces fraud "in the sale" of a security); *In re Par Pharmaceutical, Inc. Securities Litigation*, 733 F. Supp. 668 (SDNY 1990) (violation of § 10(b) and Rule 10b–5 involving fraud in connection with the purchase of securities cannot be a predicate offense), with *In re Catanella and E. F. Hutton & Co. Securities Litigation*, 583 F. Supp. 1388, 1425, n. 56 (ED Pa. 1984) (reach of RICO claims predicated on violations of § 10b and Rule 10b–5 encompasses "both purchases and sales"); *Lou v. Belzberg*, 728 F. Supp. 1010, 1026 (SDNY 1990) (violation of Hart-Scott-Rodino reporting requirement relates to "fraud in the sale of securities" and may constitute a RICO predicate act); *Spencer Cos. v. Agency Rent-A-Car, Inc.*, 1981–1982 CCH Fed. Sec. L. Rep. ¶ 98,361, p. 92,215 (Mass. 1981) (violation of § 13(d) reporting requirements is RICO predicate act because "[t]he remedial purpose of the statute would appear to encompass fraud committed by the purchaser of securities, as well as by the seller").

[4] See, *e. g.*, Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities," 18 Ga. L. Rev. 43, 81 (1983) ("fraud in the sale of securities" encompasses any violation of a specific antifraud or antimanipulation provision of the securities laws and regulations or use of stolen or counterfeit securities, as long as violation is by means of an actual sale of securities); Johnson, Predators Rights: Multiple Remedies for Wall Street Sharks Under the Securities Laws and RICO, 10 J. Corp. L. 3, 39–40 (1984) (allegations of violations of antifraud provisions of the federal securities laws should satisfy "fraud in the sale of securities" definition); Long, Treble Damages for Violations of the Federal Securities Laws: A Suggested Analysis and Application of the RICO Civil Cause of Action, 85 Dick. L. Rev. 201, 225–226 (1981) (any violation of federal securities laws other than reporting or "housekeeping" measures suffices to assert predicate act of "fraud in the sale of securities"); MacIntosh, Racketeer Influenced and Corrupt Organizations Act: Powerful New Tool of the Defrauded Securities Plaintiff, 31 Kan. L. Rev. 7, 30–37 (1982) ("fraud in the sale of securities" is both broader and narrower than antifraud provisions of securities laws); Mathews, Shifting the Burden of Losses in the Securities Markets: The Role of Civil RICO in Securities Litigation, 65 Notre Dame L. Rev. 896, 944–947 (1990) (securities fraud is a predicate offense only if fraud

which we need not definitively resolve here. The statute unmistakably requires that there be fraud, sufficiently willful to constitute a criminal violation, and that there be a sale of securities. At the same time, however, I am persuaded that Congress' use of the word "sale" in defining the predicate offense does not *necessarily* dictate that a RICO plaintiff have been a party to an executed sale.

Section 1961(1)'s list of racketeering offenses provides the RICO predicates for both criminal prosecutions and civil actions. Obviously there is no requirement that the Government be party to a sale before it can bring a RICO prosecution predicated on "fraud in the sale of securities." Accordingly, any argument that the offense itself embodies a standing requirement must apply only to private actions. That distinction is not tenable, however. By including a private right of action in RICO, Congress intended to bring "the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources [were] deemed inadequate." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U. S. 143, 151 (1987). Although not everyone can qualify as an appropriate "private attorney general," the prerequisites to the role are articulated, not in the definition of the predicate act, but in the civil action provisions of § 1964(c)—a plaintiff must allege "injur[y] in his business or property by reason of" a RICO violation.

Construing RICO's reference to "fraud in the sale of securities" to limit standing to purchasers and sellers would be

occurs in actual sale of a security); Tyson & August, The Williams Act After RICO: Has the Balance Tipped in Favor of Incumbent Management?, 35 Hastings L. J. 53, 79–80 (1983) (criminal violations of antifraud provisions of the securities laws should constitute racketeering activity, provided that the conduct is in connection with purchase or sale of securities); Note, Application of the Racketeer Influenced and Corrupt Organizations Act (RICO) to Securities Violations, 8 J. Corp. L. 411, 430–431 (1983) ("fraud in the sale of securities" applies to fraudulent purchase as well as fraudulent sale of securities).

in tension with our reasoning in *Blue Chip Stamps*. In that case, the Court admitted that it was not "able to divine from the language of § 10(b) the express 'intent of Congress' as to the contours of a private cause of action under Rule 10b–5." 421 U. S., at 737. The purchaser/seller standing limitation in Rule 10b–5 damages actions thus does not stem from a construction of the phrase "in connection with the purchase or sale of any security." Rather, it rests on the relationship between § 10(b) and other provisions of the securities laws, *id.*, at 733–736, and the practical difficulties in granting standing in the absence of an executed transaction, *id.*, at 737–749, neither of which are relevant in the RICO context.

Arguably, even if § 10(b)'s reference to fraud "*in connection with*" the sale of a security is insufficient to limit the plaintiff class to purchasers and sellers, § 1961(1)'s reference to fraud "*in*" the sale of a security performs just such a narrowing function. But we have previously had occasion to express reservations on the validity of that distinction. In *United States* v. *Naftalin*, 441 U. S. 768 (1979), we reinstated the conviction of a professional investor who engaged in fraudulent "short selling" by placing orders with brokers to sell shares of stock which he falsely represented that he owned. This Court agreed with the District Court that Naftalin was guilty of fraud "in" the "offer" or "sale" of securities in violation of § 17(a)(1) of the Securities Act of 1933, 15 U. S. C. § 77q(a)(1), even though the fraud was perpetrated on the brokers, not their purchasing clients. The Court noted:

> "[Naftalin] contends that the requirement that the fraud be 'in' the offer or sale connotes a narrower range of activities than does the phrase 'in connection with,' which is found in § 10(b) . . . . First, we are not necessarily persuaded that 'in' is narrower than 'in connection with.' Both Congress, see H. R. Rep. No. 85, 73d Cong., 1st Sess., 6 (1933), and this Court, see *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S. 6, 10

(1971), have on occasion used the terms interchangeably. But even if 'in' were meant to connote a narrower group of transactions than 'in connection with,' there is nothing to indicate that 'in' is narrower in the sense insisted upon by Naftalin." 441 U. S., at 773, n. 4.

So also in today's case. To the extent that there is a meaningful difference between Congress' choice of "in" as opposed to "in connection with," I do not view it as limiting the class of RICO plaintiffs to those who were parties to a sale. Rather, consistent with today's decision, I view it as confining the class of defendants to those proximately responsible for the plaintiff's injury and excluding those only tangentially "connect[ed] with" it.

In *Blue Chip Stamps*, we adopted the purchaser/seller standing limitation in § 10(b) cases as a prudential means of avoiding the problems of proof when no security was traded and the nuisance potential of vexatious litigation. 421 U. S., at 738–739. In that case, however, we were confronted with limiting access to a private cause of action that was judicially implied. We expressly acknowledged that "if Congress had legislated the elements of a private cause of action for damages, the duty of the Judicial Branch would be to administer the law which Congress enacted; the Judiciary may not circumscribe a right which Congress has conferred because of any disagreement it might have with Congress about the wisdom of creating so expansive a liability." *Id.*, at 748. To be sure, the problems of expansive standing identified in *Blue Chip Stamps* are exacerbated in RICO. In addition to the threat of treble damages, a defendant faces the stigma of being labeled a "racketeer." Nonetheless, Congress *has* legislated the elements of a private cause of action under RICO. Specifically, Congress has authorized "*[a]ny* person injured in his business or property by reason of" a RICO violation to bring suit under §1964(c). Despite the very real specter of vexatious litigation based on speculative damages, it is within Congress' power to create a private right of ac-

tion for plaintiffs who have neither bought nor sold securities. For the reasons stated above, I think Congress has done so. "That being the case, the courts are without authority to restrict the application of the statute." *United States* v. *Turkette,* 452 U. S. 576, 587 (1981).

In sum, we granted certiorari to resolve a split among the Circuits as to whether a nonpurchaser or nonseller of securities could assert RICO claims predicated on violations of § 10(b) and Rule 10b–5. See cases cited n. 1, *supra.* I recognize that, like the case below, some of those decisions might have been more appropriately cast in terms of proximate causation. That we have now more clearly articulated the causation element of a civil RICO action does not change the fact that the governing precedent in several Circuits is in disagreement as to *Blue Chip Stamps'* applicability in the RICO context. Because that issue was decided below and fully addressed here, we should resolve it today. I would sustain the Court of Appeals' determination that RICO plaintiffs alleging predicate acts of fraud in the sale of securities need not be actual purchasers or sellers of the securities at issue. Accordingly, I join all of the Court's opinion except Part IV.

JUSTICE SCALIA, concurring in the judgment.

I agree with JUSTICE O'CONNOR that in deciding this case we ought to reach, rather than avoid, the question on which we granted certiorari. I also agree with her on the answer to that question: that the purchaser-seller rule does not apply in civil RICO cases alleging as predicate acts violations of Securities and Exchange Commission Rule 10b–5, 17 CFR § 240.10b–5 (1991). My reasons for that conclusion, however, are somewhat different from hers.

The ultimate question here is statutory standing: whether the so-called *nexus* (mandatory legalese for "connection") between the harm of which this plaintiff complains and the defendant's so-called predicate acts is of the sort that will sup-

port an action under civil RICO. See *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 497 (1985). One of the usual elements of statutory standing is proximate causality. It is required in RICO not so much because RICO has language similar to that of the Clayton Act, which in turn has language similar to that of the Sherman Act, which, by the time the Clayton Act had been passed, had been interpreted to include a proximate-cause requirement; but rather, I think, because it has always been the practice of common-law courts (and probably of all courts, under all legal systems) to require as a condition of recovery, unless the legislature specifically prescribes otherwise, that the injury have been proximately caused by the offending conduct. Life is too short to pursue every human act to its most remote consequences; "for want of a nail, a kingdom was lost" is a commentary on fate, not the statement of a major cause of action against a blacksmith. See *Associated General Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519, 536 (1983).

Yet another element of statutory standing is compliance with what I shall call the "zone-of-interests" test, ·which seeks to determine whether, apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefited by the provision at issue.* Judicial inference of a zone-of-interests requirement, like judicial inference of a proximate-cause requirement, is a background practice against which Congress legislates. See *Block* v. *Community Nutrition Institute*, 467 U. S. 340, 345–348 (1984). Sometimes considerable limitations upon the zone of interests are set forth explicitly in the statute itself—but rarely, if ever, are those limitations so complete that they are

---

*My terminology may not be entirely orthodox. It may be that proximate causality is *itself* an element of the zone-of-interests test as that phrase has ordinarily been used, see, *e. g., Wyoming* v. *Oklahoma,* 502 U. S. 437, 473 (1992) (SCALIA, J., dissenting), but that usage would leave us bereft of terminology to connote those aspects of the "violation-injury connection" aspect of standing that are distinct from proximate causality.

deemed to preclude the judicial inference of others. If, for example, a securities fraud statute specifically conferred a cause of action upon "all purchasers, sellers, or owners of stock injured by securities fraud," I doubt whether a stockholder who suffered a heart attack upon reading a false earnings report could recover his medical expenses. So also here. The phrase "any person injured in his business or property by reason of" the unlawful activities makes clear that the zone of interests does not extend *beyond* those injured in that respect—but does not necessarily mean that it includes *all* those injured in that respect. Just as the phrase does not exclude normal judicial inference of proximate cause, so also it does not exclude normal judicial inference of zone of interests.

It seems to me obvious that the proximate-cause test and the zone-of-interests test that will be applied to the various causes of action created by 18 U. S. C. § 1964 are not uniform, but vary according to the nature of the criminal offenses upon which those causes of action are based. The degree of proximate causality required to recover damages caused by predicate acts of sports bribery, for example, see 18 U. S. C. § 224, will be quite different from the degree required for damages caused by predicate acts of transporting stolen property, see 18 U. S. C. §§ 2314–2315. And so also with the applicable zone-of-interests test: It will vary with the underlying violation. (Where the predicate acts consist of different criminal offenses, presumably the plaintiff would have to be within the degree of proximate causality and within the zone of interests as to all of them.)

It also seems to me obvious that unless some reason for making a distinction exists, the background zone-of-interests test applied to one cause of action for harm caused by violation of a particular criminal provision should be the same as the test applied to another cause of action for harm caused by violation of the same provision. It is principally in this respect that I differ from JUSTICE O'CONNOR's analysis,

*ante,* at 280 (opinion concurring in part and concurring in judgment). If, for example, one statute gives persons injured by a particular criminal violation a cause of action for damages, and another statute gives them a cause of action for equitable relief, the persons coming within the zone of interests of those two statutes would be identical. Hence the relevance to this case of our decision in *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975). The predicate acts of securities fraud alleged here are violations of Rule 10b–5; and we held in *Blue Chip Stamps* that the zone of interests for civil damages attributable to violation of that provision does not include persons who are not purchasers or sellers. As I have described above, just as RICO's statutory phrase "injured in his business or property by reason of" does not extend the rule of proximate causation otherwise applied to congressionally created causes of action, so also it should not extend the otherwise applicable rule of zone of interests.

What prevents that proposition from being determinative here, however, is the fact that *Blue Chip Stamps* did not involve application of the background zone-of-interests rule to a congressionally created Rule 10b–5 action, but rather specification of the contours of a Rule 10b–5 action "implied" (*i. e.,* created) by the Court itself—a practice we have since happily abandoned, see, *e. g., Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 568–571, 575–576 (1979). The policies that we identified in *Blue Chip Stamps, supra,* as supporting the purchaser-seller limitation (namely, the difficulty of assessing the truth of others' claims, see *id.,* at 743–747, and the high threat of "strike" or nuisance suits in securities litigation, see *id.,* at 740–741) are perhaps among the factors properly taken into account in determining the zone of interests covered by a statute, but they are surely not alone enough to restrict standing to purchasers or sellers under a text that contains no hint of such a limitation. I think, in other words, that the limitation we approved in *Blue Chip Stamps* was essentially a legislative judgment rather than an

interpretive one. Cf. *Franklin* v. *Gwinnett County Public Schools, ante,* at 77 (SCALIA, J., concurring in judgment). It goes beyond the customary leeway that the zone-of-interests test leaves to courts in the construction of statutory texts.

In my view, therefore, the Court of Appeals correctly rejected the assertion that SIPC had no standing because it was not a purchaser or seller of the securities in question. A proximate-cause requirement also applied, however, and I agree with the Court that that was not met. For these reasons, I concur in the judgment.