William SHEPERD, an individual, Mary Jo Sheperd, an individual, Plaintiffs,

v.

AMERICAN HONDA MOTOR CO., INC., et al., Defendants.

No. C–92–0870 EFL.

United States District Court,
N.D. California.

Jan. 25, 1993.

Order Denying Motion For
Reconsideration May 28, 1993.

Joseph L. Alioto, Mitchell Blumenthal, San Francisco, CA, for plaintiffs.

J. Donald McCarthy, Lyon & Lyon, Los Angeles, CA, for defendants American Honda Motor Co., Honda Motor Co. Ltd., James Cardiges and Dennis Joslyn.

Barry D. Hovis, Adams, Sadler & Hovis, San Francisco, CA, for defendant Lloyd Wise Honda.

John W. Crittenden, Cooley, Godward, Castro & Huddleson & Tatum, San Francisco, CA, for defendant Vsghm of Oakland, Inc.

## ORDER GRANTING MOTION TO DISMISS

LYNCH, District Judge.

### I. BACKGROUND

This suit involves two federal counts brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as several pendent state law claims—breach of covenant of good faith and fair dealing, fraud, negligent misrepresentation, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage. The case was removed by defendants to this Court from the Superior Court of Contra Costa County.

Defendants in this case include American Honda Motor Company, Inc. ("American Honda"), Honda Motor Co. Ltd. of Japan, three Honda car dealerships situated in Northern California, and three individuals associated with American Honda. Defendants have filed motions to dismiss this case on several grounds. The Court, after considering the parties' briefs in this matter, announced its tentative inclination to grant defendants' motions to dismiss at a November 13, 1992 hearing. However, in an abundance of fairness to plaintiffs in this case, the Court requested further briefing on three issues pertaining to plaintiffs' RICO claims: (1) the requirement of standing as set forth in *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303 (9th Cir.1992); (2) the requirement that the RICO enterprise be distinct from the pattern of predicate acts; and (3) the requirement that defendants have managerial control of the RICO enterprise.

Having carefully considered the parties' original and supplemental briefs in this matter, the Court will grant defendants' motion to dismiss with respect to plaintiffs' RICO claims and tentatively deny plaintiffs' request for leave to amend. And the Court will, in the discretionary exercise of its jurisdiction over pendent claims, remand this case to state court for the adjudication of the remaining state law claims.

### II. DISCUSSION

The allegations of plaintiffs' complaint are briefly summarized below. Plaintiffs have operated a dual Pontiac and Honda car dealership in Concord, California since 1973. From 1973 through the mid–1980s plaintiffs' Honda dealership was profitable. From 1973 through the present, American Honda and the other RICO defendants perpetrated a scheme ("the 'turn and earn' scheme") of false reporting of dealer sales. The scheme was aimed at increasing allocations of Honda vehicles to the United States and promoting one of Honda's cars, the Accord, as the number one selling nameplate.

In the years 1987–1988, plaintiff William Sheperd acted as president of the Northern California Motor Car Dealers Association ("NCMCDA"). During his tenure as president of the NCMCDA, he assisted in the drafting and promoted the passage of the Broker–Dealer Act which, among other things, expressly prohibited the falsification of sales records by car dealerships, Cal.Veh. Code § 11731 et seq. Sometime during plaintiff's tenure as president, he made known to the RICO defendants that he would not engage in unlawful activities involving the reporting of "sham" and "phantom" sales.

Dealers who went along with the unlawful false reporting practices of the RICO defendants were rewarded with a superior mix of highly popular vehicles. Those who were not cooperative, such as plaintiffs, were punished with lower allocations and allocations of more unpopular models. Beginning around January 1989, plaintiffs' dealership began receiving inferior allocations of cars because of plaintiffs' refusal to engage in false reporting in contravention of the Broker–Dealer Act. As a result of defendants' wrongful diversion of popular cars from plaintiffs' dealership to other dealerships, plaintiffs' dealership became unable to compete effectively with other dealerships, and its business suffered greatly. In March 1991 plaintiffs sold their dealership at a distressed price, which reflected the dealership's inability to compete effectively in light of defendants' ongoing misallocation of cars.

### A. *Plaintiffs' RICO Standing*

The Court's discussion herein addresses the requirements for RICO standing—proximate cause and concrete financial loss—as set forth in two recent cases: (1) the Supreme Court's decision in *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); and (2) the Ninth Circuit's opinion in *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303 (1992).

The Supreme Court announced in *Holmes* that Congress, in its promulgation of 18 U.S.C. § 1964(c), intended to import a proximate cause requirement into the RICO statutory scheme. *Holmes*, —— U.S. ——, 112 S.Ct. at 1318. The Supreme Court, referring to the many forms the principle of proximate cause had assumed at common law, found that the RICO proximate cause requirement embodied "a demand for some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Quoting from *Associated General Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 534, 103 S.Ct. 897, 906, 74 L.Ed.2d 723 (1983), an earlier Supreme Court decision which had quoted from Justice Holmes, the Court wrote, " 'The general tendency of the law, in regard to damages at least, is not to go beyond the first step.' " *Id.* —— U.S. at ——, 112 S.Ct. at 1319.

In *Holmes* the Supreme Court reversed the Ninth Circuit's finding of proximate case in a factual context analogous to the context of the case at bar. The plaintiff in *Holmes* was the Securities Investor Protection Corporation ("SIPC"). It alleged that defendants had conspired in a stock manipulation scheme that had disabled two broker-dealers from meeting obligations to customers. The SIPC brought suit on behalf of customers of the disabled broker-dealers whom the SIPC had reimbursed for losses after the broker-dealers had become insolvent.

Assuming, arguendo, that the SIPC could as a subrogee assert the rights of these customers of the disabled broker-dealers, the Court nevertheless found that the link between the alleged stock manipulation and the harm to the customers was too remote to be actionable under RICO since such harm was purely contingent on the harm suffered by the broker-dealers. According to the Court, insolvency of the broker-dealers was the harm caused by the defendants, and this insolvency in turn left the broker-dealers unable to pay the injured customers' claims. It was only the intervening insolvency of the broker-dealers that connected the defendants' acts to the losses suffered by the customers, but a direct connection between stock manipulation and the customers' losses was lacking. Hence, the Supreme Court found that plaintiffs had failed to demonstrate proximate cause.

The Ninth Circuit in *Imagineering*, 976 F.2d 1303, elucidated the proximate cause requirement adopted by the Supreme Court

in *Holmes* and reaffirmed the injury requirement it had enunciated in earlier cases. In *Imagineering,* plaintiffs were two minority and woman-owned business enterprises ("MWBEs") who appealed the dismissal of their action against two government contractors which had allegedly procured government contracts for public works construction contracts by circumventing government regulations requiring the use of MWBEs. Federal, state, and local set-aside regulations required certain levels of participation by MWBEs on public works construction contracts awarded to prime contractors. And government award letters to primary contractors required the participation of designated MWBEs as a condition of the contracts. According to plaintiffs, defendants developed and utilized a conduit scheme to avoid complying with the set-aside regulations while maintaining the appearance of full compliance. Each plaintiff was an MWBE subcontractor for the contractor with the lowest complying bid on at least one project improperly awarded to defendants. Plaintiff sued to recover the lost profits which they allegedly would have earned on these projects in the absence of a conduit scheme by defendants.

The Ninth Circuit cited *Holmes* for the proposition that, "there must be a direct relationship between the injury asserted and the injurious conduct alleged." *Imagineering,* 976 F.2d at 1311. Although the *Imagineering* court assumed that defendants' wrongful conduct deprived complying prime contractors of specified projects, and foreseeably deprived the plaintiff MWBE subcontractors of subcontracts on these projects, the court nonetheless found proximate cause lacking. Analogizing to the insolvent broker-dealers in *Holmes,* the court found that it was the intervening inability of the prime contractors to secure the primary contracts that was the direct cause of plaintiffs' injuries. Hence, the court found that the MWBE plaintiffs were missing the direct relationship necessary to show that the defendants had proximately caused their injuries.

The *Imagineering* court also invoked the policy concerns underlying the proximate cause "direct relationship" requirement, and found that they had been implicated. The court observed, "Essentially, the rule has more to do with problems of proof than with foreseeability." *Id.* at 1312. The court pointed out the difficulty, in the factual context before it, of ascertaining what amount of damage suffered by the plaintiffs was attributable solely to defendants' conduct, apart from other independent factors. And the court made note of the potential difficulty in apportioning damages among the prime contractors and the plaintiff subcontractors without permitting multiple recoveries.

The Ninth Circuit in *Imagineering* also preserved the validity of its line of cases addressing the RICO requirement of proof of concrete financial loss. *Id.* at 1310; *see also Oscar v. University Students Co-operative Ass'n,* 965 F.2d 783, 785 (9th Cir.1992); *Berg v. First State Ins. Co.,* 915 F.2d 460, 464 (9th Cir.1990). Indeed, there is some suggestion in the *Imagineering* opinion that the Ninth Circuit, to recognize a cognizable RICO injury, might even require proof that plaintiff actually paid money out as a result of racketeering activity. *See Imagineering,* 976 F.2d at 1310; *see also Oscar,* 965 F.2d at 785 (citing with approval *Fleischhauer v. Feltner,* 879 F.2d 1290, 1299–31 (6th Cir.1989)).

For the following reasons, which seem to this Court to echo concerns traditionally embodied in the proximate cause requirement, the *Imagineering* court found that plaintiffs had failed to allege a sufficiently concrete financial loss. First, the Court found that even if the specified government projects had not been awarded to defendants, plaintiffs nonetheless could not establish that those contracts would have been awarded to plaintiffs' prime contractors. The court, in reaching this conclusion, relied upon a Washington state law which would have permitted the awarding agency to reject all bids and readvertise for a new round of bidding. Second, the Court found that, even assuming plaintiffs' prime contractors would have received the contracts and that they were obligated to award subcontracting work to the plaintiffs, there nonetheless was no guarantee that other subcontractors would not be substituted for plaintiffs during the pendency of the con-

tracts. Finally, from the failure of plaintiffs' amended complaint to designate specific bids submitted by the MWBE plaintiffs that had been accepted by the prime contractors, the *Imagineering* court found it impossible to determine whether plaintiffs were claiming loss of specific identifiable profits, as opposed to the mere opportunity to realize profits. Hence, plaintiffs' amended complaint alleged only a "speculative injury." *Id.* at 1311.

Plaintiffs William and Mary Jo Sheperd allege in this case that "hot" selling cars were diverted from their dealership to other Honda dealerships which participated in the "turn and earn" scheme of false reporting of sales. Plaintiffs' dealership, apparently, received lower allocations of cars and less popular makes and models in lieu of the diverted "hot" cars. As a result of this wrongful diversion of cars, the Sheperds allege that they became unable to compete effectively, and ultimately sold their dealership at a distressed price. The Sheperds allege damages in excess of $11 million.[1]

Although the Ninth Circuit in *Imagineering* did not go so far as to say that the wrongful conduct must have directly resulted in the disbursement of money by plaintiffs, it implicitly suggested an exacting standard in cases involving any less than this. Using the

*Imagineering* case as a benchmark, the Court cannot escape the conclusion that plaintiffs in this case have failed to allege a sufficiently direct relationship between the wrongful conduct and injury, and have failed to allege a sufficiently concrete financial loss. Although the *Imagineering* court addressed separately the questions of proximate cause and concreteness of the financial loss, the same concerns underlie both inquiries and the Court will take them up together here.[2]

The *Imagineering* opinion demonstrates that the requirement of a concrete financial loss proximately caused by the wrongful conduct of RICO defendants is not easily met. The *Imagineering* court found a "speculative" injury not proximately caused by defendants' wrongful conduct in a context far more concrete than the one before this Court. The MWBE subcontractors (*Imagineering* plaintiffs) retained by the lowest complying primary contractors in *Imagineering* were very likely to receive government contract work in the absence of foul play by the *Imagineering* defendants.[3] And when government contracts were awarded to noncomplying primary contractors (*Imagineering* defendants), the *Imagineering* plaintiffs

---

1. The Court has attempted to frame the allegations in a light most favorable to plaintiffs. The plaintiffs' complaint and RICO Case Statement, which plaintiffs submitted by order of the Court, are hardly a model of clarity.

In response to question 15 of the RICO Case Statement, which asked plaintiffs to describe the alleged injury to business or property, plaintiffs assert: "Plaintiffs were injured to the extent that as a direct and proximate result of the unlawful acts engaged in by defendants ... they (plaintiffs) were precluded from effectively competing in the marketplace thus were forced to sell their dealership at a distressed price."

Plaintiffs fail to make a response to question 16 which asked plaintiffs to describe the direct causal relationship between the alleged injury and the violation of the RICO statute. They do, however, provide some indication of the alleged causal relationship in other parts of their RICO Case Statement. In response to question 17 which asked for a listing of damages, plaintiffs assert: "[A]s the direct and proximate result of the unlawful violations of 18 U.S.C. § 1962(c) & (d) by defendants ... plaintiffs were precluded from effectively competing in the marketplace and thus forced to sell their dealership at a distressed price." In the second paragraph of their re-

sponse to question 15 about the alleged injury to business or property, plaintiffs assert: "The direct causal relationship between the injury suffered by Sheperd and the violation of the RICO statute as embodied in the Complaint are simply stated. As set forth above, [defendants] devised a scheme or artifice of reporting falsified sales ("turn and earn") and have violated both the mail fraud statute and the wire fraud statute 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively."

2. This approach comports with the approach taken by the Supreme Court in *Holmes*, — U.S. ——, 112 S.Ct. 1311.

3. Assuming all bidders had complied with government regulations pertaining to the use of MWBEs, there presumably would have been no need to re-bid the government projects, and the *Imagineering* plaintiffs would have been in line for government funds. Furthermore, the Ninth Circuit offers no explanation as to why primary contractors might substitute other subcontractors for the MWBEs they had designated (presumably the lowest MWBE bidders) during the pendency of their contracts.

lost out on specific government contract jobs—a rather tangible financial loss.

■ The alleged injuries and their causal relationship with the alleged wrongful conduct of the defendants in this case contrast markedly with those alleged in *Imagineering*. Here the Sheperd plaintiffs complain of the diversion of popular makes, models, and colors of cars to other dealerships, as well as lower allocations of cars, which impeded their ability to compete effectively and resulted in the sale of their dealership at a distressed price. There can be no doubt that the alleged diversion tactics and reduced allocations would have been likely to have some adverse effect on the profitability of the Sheperds' dealership, and consequently affect the market value of the dealership. But the financial losses reflected in reduced profitability and a distressed sale price are too attenuated from the alleged wrongful conduct of defendants to give plaintiffs standing to recover treble damages under RICO.

Unlike the *Imagineering* plaintiffs who lost out entirely on specific contract bids, the Sheperd plaintiffs encountered only the possibility of diminished profits on the sales of the vehicles they received. Unlike even a lost-volume seller in a contract case, the Sheperd plaintiffs cannot even point to specific sales which they would have made in the absence of diversionary tactics by defendants. The Sheperd plaintiffs nowhere allege that their showroom was empty or their dealership lot vacant, but only that their inventory of vehicles was such that presumably it would not turn over as fast, or with as high a profit margin, as those of their competitors. Presumably the cars allocated to the Sheperds' dealership were sold by the dealership, and generally sold above cost. Nonetheless, the dealership's inability to sell cars as quickly and profitably as competing Honda dealerships in the area resulted in diminished profitability for the Sheperds' dealership and a decline in its market value. For this Court, or a jury, to assess what portion of the dealership's diminished profitability and market value were attributable to the defendants' wrongful conduct, apart from other factors, would be an exercise in sheer speculation.

Although courts may be willing to permit such speculation in other contexts, Supreme Court and Ninth Circuit precedent indicate that it is not tolerable in the context of RICO with its provision for treble damages. The Supreme Court, in rejecting a finding of proximate cause where stock manipulation by RICO defendants had contributed to the insolvency of broker-dealers and losses by their customers, observed in *Holmes:*

> If the [plaintiff] were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets.

*Holmes,* —— U.S. at ——, 112 S.Ct. at 1320. Similarly, the Ninth Circuit in *Imagineering* made reference to the difficulty of ascertaining what amount of damage was attributable to the conduct of the non-complying primary contractors, apart from other factors. *Imagineering,* 976 F.2d at 1312.

Here a multitude of imaginable factors may have contributed to the diminished profitability of the Sheperds' dealership and its diminished market value, apart from the alleged wrongful conduct of defendants. Among other factors, the managerial decisions of those charged with the management of the Sheperds' dealership may have played a very significant role. In a highly competitive market, like that in which the Sheperds' dealership had to compete, decisions about marketing, pricing strategy, customer service, employee hiring and wages, and overhead allocations, to name a few, may be critical to the profitability and ultimate market value of a business enterprise. Second, the actions undertaken by the dealership's competitors in a fluid and competitive market could certainly influence the profitability and market value of the Sheperds' dealership. And finally, external factors like shifting demographic patterns, local economic trends and consumer demand, and local government regulation might influence the success of a particular dealership.

As the Ninth Circuit observed in *Imagineering*, 976 F.2d at 1312, "Essentially, the [proximate cause] rule has more to do with problems of proof than foreseeability." The problems of proof in this case, where the injuries alleged are the likely byproduct of a wide range of contributing factors, are simply too momentous for plaintiffs to overcome. The Court finds, therefore, that the Sheperd plaintiffs have failed to allege a concrete financial loss which resulted directly from the wrongful conduct of defendants. Hence plaintiffs lack RICO standing. Accordingly, the Court will grant defendants' motions to dismiss plaintiffs' RICO claims.

### B. *Plaintiffs' Request for Leave to Amend*

In the last line of the final page of their supplemental brief, plaintiffs request that if the Court should grant defendants' motion to dismiss, that plaintiffs be granted leave to amend their complaint to "be in compliance with any rulings the Court may issue." Plaintiffs have utterly failed to state any grounds for their request, nor have they given the Court any indication as to how they would amend their complaint consistent with the Court's rulings and the confines of Rule 11 Fed.R.Civ.P.

■■■ Although leave to amend shall be freely given when justice so requires, Fed. R.Civ.P. 15(a), futile amendments should not be permitted. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Smith v. Commanding Officer, Air Force Accounting*, 555 F.2d 234, 235 (9th Cir.1977). The proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6) of the Federal Rules of Civil Procedure. 3 J. Moore, *Moore's Federal Practice* § 15.08[4] (2d ed. 1974).

Here the Court finds that amendment by plaintiffs would likely be futile in light of the Court's discussion in part II–A of this Order. Accordingly, the Court will tentatively deny plaintiffs' request for leave to amend. Nonetheless, the Court will consider a motion for reconsideration of this decision if filed by plaintiffs no later than January 29, 1993. Any such motion should state with specificity how plaintiffs propose to amend their complaint to overcome the deficiencies discussed in this Order. The Court's tentative ruling on amendment will become final if no motion is timely filed.

### C. *Pendent State Law Claims*

The Court will, in the exercise of its discretion, decline to exercise jurisdiction over plaintiffs' remaining pendent state law claims. Since this case was removed to federal court, the Court shall remand the case to the Superior Court of Contra Costa County from whence it came. Jurisdiction, however, shall temporarily remain in this Court pending the Court's consideration of any timely motion for reconsideration which may be filed by plaintiffs pursuant to paragraph four below.

### III. CONCLUSION

For all of the reasons stated above, the Court hereby ORDERS that:

(1) Defendants' motions to dismiss are granted with respect to plaintiffs' RICO claims;

(2) Plaintiffs' request for leave to amend the complaint is tentatively denied;

(3) All remaining state law claims—breach of contract, breach of covenant of good faith and fair dealing, fraud, negligent misrepresentation, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage—shall be remanded to the Superior Court of Contra Costa County in light of this Court's decision to not exercise its supplemental (pendent) jurisdiction over these claims. Jurisdiction, however, shall remain in this Court pending the Court's consideration of a motion for reconsideration which may be filed by plaintiffs pursuant to paragraph four.

(4) Plaintiffs are invited to file a motion for reconsideration of the Court's decision to deny leave to amend, stating with specificity how they propose to amend the complaint to overcome the deficiencies discussed in this

Order. Plaintiffs' motion, if any, as well as any accompanying memorandum may be filed no later than January 29, 1993. Defendants may respond with opposition briefs no later than February 5, 1993;

(5) This Order shall automatically become the Court's final ruling in this case if plaintiffs fail to timely file a motion for reconsideration pursuant to paragraph four above.

IT IS SO ORDERED.

## ORDER DENYING MOTION FOR RECONSIDERATION

In its Order of January 25, 1993, in which the Court granted defendants' motion to dismiss, the Court tentatively denied plaintiffs' request for leave to amend based on plaintiffs' failure to propose how they would amend the complaint to overcome the deficiencies discussed in the Court's Order. The Court invited plaintiff to file a motion for reconsideration to explain with specificity how it would overcome the deficiencies in its original complaint. This matter is now before the Court on plaintiffs' motion for reconsideration. Having carefully considered the parties briefs and supporting papers, the Court deems it proper to confirm its Order of January 25, 1993 and dismiss plaintiffs' RICO claim with prejudice.

■ Plaintiffs propose to amend their complaint to allege a specific number (200) of automobiles diverted from their dealership from the period January 1, 1989 through March 1991; a specific profit margin ($1,200.00) with regard to each automobile; and a specific monetary damages figure based on the diversion of such automobiles ($240,000.00).

Plaintiffs apparently misapprehend the substance of the Court's previous ruling. The plaintiffs in *Imagineering Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303 (9th Cir.1992), were able to point to specific subcontracts they lost out on, similar to the 200 specific cars plaintiffs point to this case. Plaintiffs cannot, by merely supplying concrete figures to supplement their complaint, cure the fundamental defect in their original complaint.

As this Court explained at some length in its previous Order, the Sheperds in essence complain of diminished profitability stemming from their receipt of a "mix" of models less attractive than that supplied to their competitors. The Court explained in its Order of January 25, 1993:

Here the Sheperd plaintiffs complain of the diversion of popular makes, models, and colors of cars to other dealerships, as well as lower allocations of cars, which impeded their ability to compete effectively and resulted in the sale of their dealership at a distressed price. There can be no doubt that the alleged diversion tactics and reduced allocations would have been likely to have some adverse effect on the profitability of the Sheperds' dealership, and consequently affect the market value of the dealership. But the financial losses reflected in reduced profitability and a distressed sale price are too attenuated from the alleged wrongful conduct of defendants to give plaintiffs standing to recover treble damages under RICO.

Unlike the *Imagineering* plaintiffs who lost out entirely on specific contract bids, the Sheperd plaintiffs encountered only the possibility of diminished profits on the sales of the vehicles they received. Unlike even a lost-volume seller in a contract case, the Sheperd plaintiffs cannot even point to specific sales which they would have made in the absence of diversionary tactics by defendants. The Sheperd plaintiffs nowhere allege that their showroom was empty or their dealership lot vacant, but only that their inventory of vehicles was such that presumably it would not turn over as fast, or with as high a profit margin, as those of their competitors. Presumably the cars allocated to the Sheperds' dealership were sold by the dealership, and generally sold above cost. Nonetheless, the dealership's inability to sell cars as quickly and profitably as competing Honda dealerships in the area resulted in diminished profitability for the Sheperds' dealership and a decline in its market value. For this Court, or a jury, to assess what portion of the dealership's diminished profitability and market value were attributable to the defendants' wrongful conduct,

apart from other factors, would be an exercise in sheer speculation. * * *

Here a multitude of imaginable factors may have contributed to the diminished profitability of the Sheperds' dealership and its diminished market value, apart from the alleged wrongful conduct of defendants. Among other factors, the managerial decisions of those charged with the management of the Sheperds' dealership may have played a very significant role. In a highly competitive market, like that in which the Sheperds' dealership had to compete, decisions about marketing, pricing strategy, customer service, employee hiring and wages, and overhead allocations, to name a few, may be critical to the profitability and ultimate market value of a business enterprise. Second, the actions undertaken by the dealership's competitors in a fluid and competitive market could certainly influence the profitability and market value of the Sheperds' dealership. And finally, external factors like shifting demographic patterns, local economic trends and consumer demand, and local government regulation might influence the success of a particular dealership.

As the Ninth Circuit observed in *Imagineering*, 976 F.2d at 1312, "Essentially, the [proximate cause] rule has more to do with problems of proof than foreseeability." The problems of proof in this case, where the injuries alleged are the likely byproduct of a wide range of contributing factors, are simply too momentous for plaintiffs to overcome. * * *

("Order Granting Motion to Dismiss," Op. at 629–31).

Now the Sheperds have merely come forward with allegations regarding the specific number of diverted cars, the profits they expected to achieve on the sale of each such diverted car, and the total loss of profits to the dealership based on those figures. The Sheperds have nowhere alleged that their showroom was empty or their dealership lot vacant during the pertinent time period. The Sheperds continued to receive allocations of cars from 1989 to 1991, although allegedly they received fewer cars and some of the cars they received were not as easy to sell as diverted "hot" models. Unlike a lost-volume seller who brings a breach of contract action against a reneging buyer based on a lost sale, for whom courts generally recognize a concrete loss, here plaintiffs allege only that their supply or mix of automobiles was different from what it otherwise would have been. Plaintiff does not allege that any of its completed sales were cancelled or that its potential customers were diverted. Presumably plaintiff still had a number of "hot" models available for sale, and continued to sell cars. Thus, for every "hot" model not sold by the Sheperds by virtue of defendants' alleged diversion of the car to another dealership, plaintiff realized an opportunity to sell one of the cars already on its lot. In other words, had plaintiff received the 200 diverted cars, plaintiff may not have sold all the cars it actually did sell from 1989 to 1991. Plaintiffs are not lost-volume sellers.

Even by alleging the diversion of 200 specific cars, plaintiffs can at most establish diminished profitability flowing from slower turnover, not a concrete loss of $240,000. As the Court indicated in its previous Order, a host of factors apart from a dealership's allocation of cars, such as managerial strategy, the actions of competitors, and independent market forces, ultimately determine the dealership's profitability in a highly competitive market. For this Court or a jury to attempt to ascertain what portion of the lost profitability of the Shepherd dealership could be attributed to the diversion of 200 automobiles, as opposed to other factors, would be an exercise in sheer speculation.[1]

---

1. As the Court indicated in its Order of January 25, 1993, such speculation may be permissible in other contexts outside of RICO. However, it is clearly not permissible in a RICO action where a party stands to recover treble damages.

The Court's ruling today does nothing to condone the alleged conduct of the defendants in this case or prevent the Sheperds, and others who in the future may find themselves similarly situated, from recovering money damages in a court of law for a legal wrong. Parties who, like the Sheperds, are unable to satisfy RICO's stringent proximate cause and concrete loss requirements remain free to pursue common law or statutory state law claims. In this instance, the Sheperd plaintiffs will be able to pursue claims for breach of contract, breach of covenant of good faith and fair dealing, fraud, negligent mis-

It is noteworthy that there was no indication in *Imagineering* that the plaintiffs, in light of their failure to procure the subcontracts at issue, were thereby able to perform other profitable contracts. In this respect, the loss suffered by the *Imagineering* plaintiffs was more concrete than the loss suffered by plaintiffs in this case. Yet, the Ninth Circuit found the *Imagineering* plaintiffs had failed to allege a sufficiently concrete loss which had been proximately caused by defendants' misconduct.

Although leave to amend shall be freely given when justice so requires, Fed.R.Civ.P. 15(a), the law is well settled that futile amendments should not be permitted. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Smith v. Commanding Officer, Air Force Accounting*, 555 F.2d 234, 235 (9th Cir.1977). The proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6) of the Federal Rules of Civil Procedure. 3 J. Moore, *Moore's Federal Practice* § 15.08[4] (2d ed. 1974). Because the Court finds that plaintiffs' proposed amendment will not cure the deficiencies noted in this Order and the Court's Order of January 25, 1993, the Court will confirm its decision to disallow plaintiffs' proposed amendment and dismiss plaintiffs' RICO claim.[2]

## CONCLUSION

For the reasons set forth above, as well as those set forth in the Court's Order of January 25, 1993, the Court hereby ORDERS that:

(1) Plaintiffs' motion for reconsideration of the Court's Order of January 25, 1993 ("Order Granting Motion to Dismiss") is denied;

(2) All remaining state law claims—breach of contract, breach of covenant of good faith and fair dealing, fraud, negligent misrepresentation, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage—shall be remanded to the Superior Court of Contra Costa County forthwith in light of this Court's decision to not exercise its supplemental (pendent) jurisdiction over these claims;

IT IS SO ORDERED.

---

representation, negligent and intentional interference with prospective economic advantage, in state court.

**2.** In addition to urging the Court to reconsider its decision to disallow amendment, plaintiffs also urge reconsideration of the Court's ruling on defendants' motion to dismiss. Plaintiffs fail to raise any additional cases or forward any arguments the Court failed to consider in its initial ruling. Thus, the Court's January 25, 1993 Order will stand.