Justice Breyer,
concurring in part and dissenting in part.
In my view, the civil damages remedy in the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §§ 1961-1968 (2000 ed. and Supp. Ill), does not cover claims of injury by one competitor where the legitimate procompetitive activity of another competitor immediately causes that injury. I believe that this is such a case and would consequently hold that RICO does not authorize the private action here at issue.
I
A
RICO essentially seeks to prevent organized criminals from taking over or operating legitimate businesses. Its language, however, extends its scope well beyond those central purposes. RICO begins by listing certain predicate acts, called “ ‘racketeering activity,’ ” which consist of other crimes, ranging from criminal copyright activities, the facilitation of gambling, and mail fraud to arson, kidnaping, and murder. § 1961(1) (2000 ed., Supp. III). It then defines a “ ‘pattern of racketeering activity’ ” to include engaging in “at least two” predicate acts in a 10-year period. § 1961(5) (2000 ed.). And it forbids certain business-related activities involving such a “pattern” and an “enterprise.” The forbidden activities include using funds derived from a “pattern of racketeering activity” in acquiring, establishing, or operating any enterprise, and conducting the affairs of any enterprise through such “a pattern.” §§ 1962(a), (c).
*480 RICO, a federal criminal statute, foresees criminal law enforcement by the Federal Government. § 1963 (2000 ed., Supp. III). It also sets forth civil remedies. §1964 (2000 ed.). District courts “have jurisdiction to prevent and restrain [RICO] violations.” § 1964(a). And a person “injured in his business or property by reason of a [RICO] violation” may seek treble damages and attorney’s fees. § 1964(c).
B
The present case is a private RICO treble-damages action. A steel supply company, Ideal Steel, has sued a competing steel supply company, National Steel, and its owners, Joseph and Vincent Anza (to whom I shall refer collectively as “National”). Ideal says that National committed mail fraud by regularly filing false New York state sales tax returns in order to avoid paying sales tax that it owed — activity that amounts to a “pattern of racketeering activity.” This activity enabled National to charge lower prices without reducing its profit margins. Ideal says National used some of these excess profits to fund the building of a new store. Both the lower prices and the new outlet attracted Ideal customers, thereby injuring Ideal. Hence, says Ideal, it was injured “in [its] business ... by reason of” violations of two RICO provisions, the provision that forbids conducting an “enterprise’s affairs” through a “pattern of racketeering activity” and the provision that forbids investing funds derived from such a “pattern” in an “enterprise.” §§ 1962(c), (a), 1964(c). The question before us is whether RICO permits Ideal to bring this private treble-damages claim.
II
This Court, in Holmes v. Securities Investor Protection Corporation, 503 U. S. 258, 268 (1992), held that RICO’s private treble-damages provision “demanded] . . . some direct relation between the injury asserted and the injurious conduct alleged.” The Court then determined that the injury *481 alleged by the plaintiff in that case was too remote from the injurious conduct to satisfy this requirement.
I do not agree with the majority insofar as it believes that Holmes’ holding in respect to the fact pattern there at issue virtually dictates the answer to the question here. In my view, the “causal connection” between the forbidden conduct and plaintiff’s harm is, in certain key ways, more direct here than it was in Holmes. In Holmes, the RICO plaintiff was a surrogate for creditors of broker-dealers that went bankrupt after losing money in stocks that had been overvalued due to fraudulent statements made by the RICO defendant and others. Put in terms of “proximate cause,” the plaintiff’s harm (an ordinary creditor loss) differed in kind from the harm that the “predicate acts” (securities fraud) would ordinarily cause (stock-related monetary losses). The harm was “indirect” in the sense that it was entirely derivative of the more direct harm the defendant’s actions had caused the broker-dealers; and, there were several steps between the violation and the harm (misrepresentation — broker-dealer losses — broker-dealer business failure — ordinary creditor loss). Here, however, the plaintiff alleges a harm (lost customers) that flows directly from the lower prices and the opening of a new outlet — actions that were themselves allegedly caused by activity that Congress designed RICO to forbid (conducting a business through a “pattern” of “predicate acts” and investing in business funds derived from such a “pattern”). In this sense, the causal links before us are more “direct” than those in Holmes. See ante, at 464-465 (Thomas, J., concurring in part and dissenting in part).
Nonetheless, I agree with the majority that Holmes points the way. That case makes clear that RICO contains important limitations on the scope of private rights of action. It specifies that RICO does not provide a private right of action “simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant’s violation was a ‘but for’ cause of [the] plaintiff’s injury.” 503 U. S., at 265-266 *482 (footnote omitted). Pointing out “the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover,” id., at 266 (emphasis added), Holmes concludes that RICO imposes a requirement of “proximate cause,” a phrase that “label[s] generically the judicial tools used to limit a person’s responsibility for the consequences of that person’s own acts,” id., at 268. It recognizes that these tools seek to discern “ ‘what justice demands, or . . . what is administratively possible and convenient.’” Ibid, (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)). It also explains that “proximate cause” demands “directness,” while specifying that “directness” is only one of “the many shapes this concept took at common law.” 503 U. S., at 268, 269. And it points to antitrust law, both as a source of RICO’s treble-damages provisions and as an aid to their interpretation. Ibid.
In my view, the “antitrust” nature of the treble-damages provision’s source, taken together with both RICO’s basic objectives and important administrative concerns, implies that a cause is “indirect,” i. e., it is not a “proximate cause,” if the causal chain from forbidden act to the injury caused a competitor proceeds through a legitimate business’ ordinary competitive activity. To use a physical metaphor, ordinary competitive actions undertaken by the defendant competitor cut the direct causal link between the plaintiff competitor’s injuries and the forbidden acts.
The basic objective of antitrust law is to encourage the competitive process. In particular, that law encourages businesses to compete by offering lower prices, better products, better methods of production, and better systems of distribution. See, e. g., 1 R Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 100a, pp. 3-4 (2d ed. 2000). As I shall explain, these principle's suggest that RICO does not permit private action based solely upon this competitive type of harm, i. e., *483 harm a plaintiff suffers only because the defendant was able to attract customers through normal competitive methods, such as lower prices, better products, better methods of production, or better systems of distribution. In such cases, the harm falls outside the limits that RICO’s private treble-damages provision’s “proximate-cause” requirement imposes. In such cases the distance between the harm and the predicate acts that funded (or otherwise enabled) such ordinary competitive activity is too distant. The harm is not “direct.”
At the same time, those principles suggest that other types of competitive injuries not within their protective ambit could lie within, not outside, “proximate-cause” limits. Where, for example, a RICO defendant attracts customers in ways that involve illegitimate competitive means, e. g., by threatening violence, a claim may still lie. Claims involving RICO violations that objectively target a particular competitor, e. g., bribing an official to harass a competitor, could also be actionable.
Several considerations lead to this conclusion. First, I have found no case (outside the Second Circuit, from which this case arose) in which a court has authorized a private treble-damages suit based upon no more than a legitimate business’ ordinary procompetitive activity (even where financed by the proceeds of a RICO predicate act).
Second, an effort to bring harm caused by ordinary competitive activity within the scope of RICO’s private treble-damages action provision will raise serious problems of administrability. Ante, at 458-460 (majority opinion); see also Holmes, supra, at 269. To demonstrate that a defends ant’s lower price caused a plaintiff to lose customers (or profits) requires the plaintiff to show what would have happened in its absence. Would customers have changed suppliers irrespective of the price change because of other differences in the suppliers? Would other competing firms have lowered their prices? Would higher prices have at *484 tracted new entry? Would demand for the industry’s product, or the geographic scope of the relevant market, have changed? If so, how? To answer such questions based upon actual market circumstances and to apportion damages among the various competitors harmed is difficult even for plaintiffs trying to trace harm caused by a defendants’ anti-competitive behavior. Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U. S. 519, 542, 544 (1983) (the possibility that harm “may have been produced by independent factors” and “the danger of complex apportionment of damages” weigh against finding the requisite causal connection in an antitrust case). To answer such questions in the context of better functioning markets, where prices typically reflect competitive conditions, would likely prove yet more difficult.
Third, where other victims, say, victims of the underlying RICO “predicate acts” are present, there is no pressing need to provide such an action. Those alternative victims (here the State of New York) typically “could be counted on to bring suit for the law’s vindication.” Holmes, supra, at 273. They could thus fulfill Congress’ aim in adopting the civil remedy of “turning victims] into prosecutors, ‘private attorneys general,’ dedicated to eliminating racketeering activity.” Rotella v. Wood, 528 U. S. 549, 557 (2000) (citing Klehr v. A. O. Smith Corp., 521 U. S. 179, 187 (1997)).
Fourth, this approach to proximate cause would retain private actions aimed at the heart of Congress’ relevant RICO concerns. RICO’s sponsors, in reporting their underlying reasons for supporting RICO, emphasized, not the fair, ordinary competition that an infiltrated business might offer its competitors, but the risk that such a business would act corruptly, exercising unfair methods of competition. S. Rep. No. 91-617, pp. 76-78 (1969); see also Cedric Kushner Promotions, Ltd. v. King, 533 U. S. 158, 165 (2001). RICO focuses upon the “infiltration of legitimate business by organized crime,” in significant part because, when “ ‘organized crime moves into a business, it brings all the techniques of *485 violence and intimidation which it used in its illegal businesses.’ ” Sedima, S. P. R. L. v. Imrex Co., 473 U. S. 479, 517, 515 (1985) (Marshall, J., dissenting) (quoting 113 Cong. Rec. 17999 (1967)).
My approach would not rule out private actions in such cases. Nor would it rule out three of the four suits mentioned by Justice Marshall, dissenting in Sedima, when he describes RICO’s objectives. It would not rule out lawsuits by injured competitors or legitimate investors if a racketeer, “uses ‘[t]hreats, arson and assault ... to force competitors out of business’ “uses arson and threats to induce honest businessmen to pay protection money, or to purchase certain goods, or to hire certain workers”; or “displace^]” an “honest investor” when he “infiltrates and obtains control of a legitimate business . . . through fraud” or the like. 473 U. S., at 521, 522.
I concede that the approach would rule out a competitor’s lawsuit based on no more than an “infiltrated enterprise” operating a legitimate business to a businessman’s competitive disadvantage because unlawful predicate acts helped that legitimate business build a “strong economic base.” And I recognize that this latter kind of suit at least arguably would have provided helpful deterrence had the view of Sedima’s dissenting Justices prevailed. Id., at 500-523 (Marshall, J., dissenting) (arguing that RICO’s private action provision did not authorize suits based on harm flowing directly from predicate acts); id., at 523-530 (Powell, J., dissenting) (same). But the dissent did not prevail, and the need for deterrence consequently offers only weakened support for a reading of RICO that authorizes private suits in this category.
Fifth, without this limitation, RICO enforcement and basic antitrust policy could well collide. Firms losing the competitive battle might find bases for a RICO attack on their more successful competitors in claimed misrepresentations or even comparatively minor misdeeds by that competitor. Firms *486 that fear such treble-damages suits might hesitate to compete vigorously, particularly in concentrated industries where harm to a competitor is more easily traced but where the consumer’s need for vigorous competition is particularly strong. The ultimate victim of any such tendency to pull ordinary competitive punches of course would be not the competing business, but the consumer. Although Congress did not intend its RICO treble-damages provision as a simple copy of the antitrust laws’ similar remedies, see, e. g., Sedima, supra, at 498-499, there is no sound reason to interpret RICO’s treble-damages provision as if Congress intended to set it and its antitrust counterpart at cross-purposes.
For these reasons, I would read into the private treble-damages provision a “proximate-cause” limitation that places outside the provision harms that are traceable to an unlawful act only through a form of legitimate competitive activity.
Ill
Applying this approach to the present case, I would hold that neither of Ideal’s counts states a RICO private treble-damages claim. National is a legitimate business. Another private plaintiff (the State of New York) is available. The question is whether Ideal asserts a harm caused directly by something other than ordinary competitive activity, i. e., lower prices, a better product, a better distribution system, or a better production method.
Ideal’s second count claims injury caused by National’s (1) having taken customers (2) attracted by its new store (3) that it financed in part through profits generated by the tax fraud scheme, and the financing is the relevant violation. § 1962(a). The opening of a distribution outlet is a legitimate competitive activity. It benefits the firm that opens it by making it more convenient for customers to purchase from that supplier. That ordinary competitive process is all the complaint describes. And for the reasons I have given *487 in Part II, supra, I believe that the financing of a new store — even with funds generated by unlawful activities — is not sufficient to create a private cause of action as long as the activity funded amounts to legitimate competitive activity. Ideal must look for other remedies, e. g., bringing the facts to the attention of the United States Attorney or the State of New York.
Ideal’s first count presents a more difficult question. It alleges that National filed false sales tax returns to the State of New York. As an action indictable under the federal mail fraud statute, that action is a predicate act under RICO. See §1961(1) (2000 ed., Supp. III). National passed these savings on to its cash customers by not charging them sales tax, thereby attracting more cash customers than it would have without the scheme. Is this a form of injury caused, not by ordinary competitive activity, but simply by the predicate act itself?
In my view, the answer to this question is “no.” The complaint alleges predicate acts that amount simply to the facts that National did not “charge” or “pay” sales taxes or accurately “report” sales figures to the State. National did not tell its customers, “We shall not pay sales taxes.” Rather, it simply charged the customer a lower price, say, $100 rather than $100 plus $8 tax. Consider a retailer who advertises to the customer a $100 table and adds, “We pay all sales taxes.” Such a retailer is telling the customer that he will charge the customer a lower price by the amount of the tax, i. e., about $92. The retailer implies that he, the retailer, will pay the tax to the State, taking the requisite amount owed to the State from the $100 the customer paid for the item.
The defendants here have done no more. They have in effect cut the price of the item by the amount of the sales tax and then kept the money instead of passing it on to the State. They funded the price cut from the savings, but the *488 source of the savings is, in my view, beside the point as long as the price cut itself is legitimate. I can find nothing in the complaint that suggests it is not.
For these reasons, I would reverse the decision of the Court of Appeals on both counts.