

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-5-2009

# Longmont United Hosp v. St. Barnabas Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3236

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Longmont United Hosp v. St. Barnabas Corp" (2009). *2009 Decisions*. Paper 2078.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/2078

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-3236
_____

LONGMONT UNITED HOSPITAL;
MAINE COAST MEMORIAL HOSPITAL, on behalf of
themselves, and on behalf of a Class of all
others similarly situated


v.


SAINT BARNABAS CORPORATION, d/b/a SAINT BARNABAS HEALTH
CARE SYSTEM; CLARA MAASS MEDICAL CENTER; COMMUNITY
MEDICAL CENTER; IRVINGTON GENERAL HOSPITAL; KIMBALL MEDICAL
CENTER; MONMOUTH MEDICAL CENTER; NEWARK BETH-ISRAEL MEDICAL
CENTER; SAINT BARNABAS MEDICAL CENTER; UNION HOSPITAL;
WAYNE GENERAL HOSPITAL; CLARA MAASS MEDICAL CENTER-WEST
HUDSON;
THE OFFICERS OF SAINT BARNABAS CORPORATION, during the periods relevant
hereto, as individuals in their official capacities; THE BOARD OF
TRUSTEES OF ST. BARNABAS CORPORATION during the periods relevant
hereto, as individuals in their official capacities


Longmont United Hospital,
Appellant


_____


On Appeal from the United States District Court
for the District of New Jersey
District Court No. 06-CV-02802
District Judge: The Honorable Dennis M. Cavanaugh

1

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 23, 2008

Before: RENDELL and SMITH, *Circuit Judges*,
and POLLAK, *District Judge**

(Filed: January 05, 2009 )

OPINION

SMITH, *Circuit Judge*.

This case arises out of a purported scheme to defraud the federal government

through the practice of "turbocharging." At its simplest level, the Saint Barnabas

Corporation ("SBC"), through a consortium of hospitals that it owned and operated

throughout New Jersey, allegedly received excessive Medicare payments by reporting

inflated patient treatment costs. After SBC settled a *qui tam* action with the United

States,[1] Longmont United Hospital ("Longmont"), a Medicare participant located in

Colorado, filed a class action suit, claiming, *inter alia*, four violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*[2] On June

_____

[*]The Honorable Louis H. Pollak, Senior District Judge for the United States
District Court for the Eastern District of Pennsylvania, sitting by designation.

[1]The settlement agreement expressly provided that it was not an admission of
SBC's liability.

[2]Specifically, Longmont alleged that SBC committed two RICO violations under
18 U.S.C. § 1962(c), and participated in a conspiracy to commit those RICO violations

2

26, 2007, the District Court granted SBC's motion to dismiss Longmont's RICO claims under Fed. R. Civ. P. 12(b)(6) because it held that Longmont's complaint failed to show both proximate causation and SBC's participation in a RICO "enterprise." Because we agree with the District Court that SBC's conduct was not the proximate cause of Longmont's injuries, we will affirm.[3]

Inasmuch as we write primarily for the parties, who are familiar with this case, we need not repeat the factual or procedural background.

Under the civil RICO statute, "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate

---

under 18 U.S.C. § 1962(d). The "racketeering activity" asserted was multiple instances of mail and wire fraud, and criminal transporting and receiving stolen or converted money. *See* 18 U.S.C. §§ 1341, 1343, 2314, and 2315.

In addition to SBC, Longmont also named as defendants ten hospitals associated with SBC and the officers and trustees of SBC. The complaint claimed unfair competition against SBC and the hospitals, and negligence against all defendants. Longmont withdrew the negligence claims before the District Court made a ruling on SBC's motion to dismiss, and has not appealed the District Court's decision to dismiss its unfair competition claim. SBC is the only named defendant remaining.

Finally, Maine Coast Memorial Hospital, a plaintiff in the action before the District Court, has not appealed the District Court's decision to grant SBC's motion to dismiss.

[3]We have jurisdiction under 28 U.S.C. § 1291, and review the District Court's decision *de novo*, *see Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). In doing so, we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id*. at 233 (internal quotations omitted). Because we hold that Longmont failed to show proximate cause, we do not need to decide whether Longmont's complaint sufficiently alleged SBC's participation in a RICO "enterprise."

3

United States district court . . . ." 18 U.S.C. § 1964(c). In order for the plaintiff to have standing to assert a RICO claim under 18 U.S.C. § 1964(c), the alleged RICO violation must be the proximate cause of the plaintiff's injury. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006); *Holmes v. Secs. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S. at 461. The motivating principles behind this need for "some direct relation between the injury asserted and the injurious conduct alleged" include: 1) the difficulty in ascertaining damages caused by remote actions; 2) the risk of duplicative recoveries; and 3) the prospect that more immediate victims of an alleged RICO violation can be expected to pursue their own claims. *Id*. at 457–60; *see also Holmes*, 503 U.S. at 269–70.

Here, we have no difficulty finding that SBC's conduct was not the proximate cause of Longmont's injuries. According to Longmont, SBC's scheme reduced Longmont's Medicare reimbursements by both increasing the cost threshold necessary to qualify for "Outlier Payments"—payments designed to compensate hospitals for treating especially costly patients—and decreasing the amount of those payments. It is clear from Longmont's complaint, however, that the Centers for Medicare & Medicaid Services ("CMS") stands between SBC's conduct and Longmont's injuries. As Longmont acknowledges, CMS is "the agency that interpreted the Medicare Act, promulgated and

4

enforced Medicare payment regulations, and through its agents administered Medicare payment[s]." (Class Action Compl. at 8 n.1.) The "Outlier [Payment] Threshold is the amount established annually by CMS." (*Id*. ¶ 49.) CMS also "assign[ed] the [statewide average] to a hospital when its [cost-to-charge ratio fell] below the National Threshold . . . ." (*Id*. ¶ 54.) This CMS policy "generate[d] excessive Outlier Payments" because the "higher [statewide average] is then applied" to the formula used to calculate Outlier Payments. (*Id*. ¶ 53.) It also allowed SBC to continue receiving excessive Outlier Payments despite auditing. (*See id*.) Therefore, SBC's alleged inflation of hospital costs did not cause Longmont's injuries; instead, it was CMS's response to this behavior—reimbursing SBC for its inflated costs without ensuring that they were justified and raising the qualification threshold for Outlier Payments in subsequent years—that led to a decrease in Longmont's Outlier Payments.

Longmont argues that CMS "merely occupied a 'spatially intermediate position' between SBC and the plaintiffs." (Br. of Appellant at 32.) Longmont focuses on the fixed loss threshold ("FLT") that CMS used to calculate the qualifying threshold for Outlier Payments.[4] According to Longmont, "the rise in the FLT was a necessary, automatic and foreseeable consequence of SBC's fraud, a consequence required by the rules governing the outlier pool." (*Id*. at 28.) Longmont asserts that, in response to

---

[4]The qualifying threshold for Outlier Payments is equal to the FLT "adjusted to apply to each hospital on the basis of an area wage adjustment and an adjustment for the type of area in which the hospital is located." (Class Action Compl. ¶ 45.)

SBC's inflated cost reporting, CMS had to increase the FLT, which in turn raised the threshold for Outlier Payments, because CMS was "mandated" to keep Outlier Payments at 5.1 percent of the projected total budget for Medicare payments. (*See id.* at 29.) Longmont, however, has not identified the source for such a mandate, nor what other "rules governing the outlier pool" made the rise in FLT "necessary, automatic and foreseeable." This is not surprising. No such mandate or rule exists. CMS's governing statute only required it to keep Outlier Payments between five and six percent of estimated total Medicare payments for that year. *See* 42 U.S.C. § 1395ww(d)(5)(A)(iv). CMS certainly had the authority to keep FLT constant as long as total Outlier Payments fell within that range.[5]

Additionally, Longmont overstates the importance of CMS's FLT-setting methodology to our proximate cause inquiry. Separate and apart from its calculation of FLT and the Outlier Payment threshold, CMS's policy of substituting a statewide average in place of below-threshold cost-to-charge ratios in calculating Outlier Payments and its failure to adequately scrutinize the accuracy of SBC's inflated cost reports are crucial in any attempt to link SBC's conduct to Longmont's harm. Indeed, regulations enacted in

---

[5]Longmont has not alleged facts sufficient to show that SBC's cost inflation, by itself, would have required CMS to raise FLT in any given year in order to meet its statutory obligations. Although Outlier Payments during the relevant time period may have ranged from 7.6 to 7.9 percent of total Medicare payments, (*see* Class Action Compl. ¶ 64) these Outlier Payments resulted from "the behavior of a few hundred hospitals" that "took advantage of the outlier program," (*id.* ¶ 70), while SBC was only alleged to have owned or operated ten different hospitals.

2003 allowed CMS to prevent conduct like SBC's from ever harming hospitals like Longmont by "adjust[ing] Outlier payments retroactively once hospitals' cost reports are audited" and forcing those who violate the rules to "repay the money they receive[d] improperly." (*See* Class Action Compl. ¶ 71.) This underscores that government discretion played a significant role in causing Longmont's alleged injuries.

Longmont also overlooks the significant temporal delay that occurred between SBC's reporting of inflated costs and Longmont's injury. At the May 8, 2007 hearing on SBC's motion to dismiss, Longmont's counsel stated that "what Congress has mandated that CMS do is to project the costs in the following year and to project what the outlier pool will consist of, but they use two-year-old data. So in 1999, they would be using 1998 data to project the 2000 year pool." (J.A. 641–42.) This means that SBC's conduct would not have influenced the amount of Outlier Payments that Longmont received until two years after SBC submitted the inflated cost report, and even then only if CMS made no changes to the way that it calculated Outlier Payments, had not discovered SBC's allegedly fraudulent actions, nor otherwise adjusted the Outlier Payments made to SBC so that they were not excessive. Finding proximate causation here would require stretching the concept past its breaking point.

The three motivating principles at the heart of the proximate cause requirement support our holding in this case. First, it would be nearly impossible to ascertain the amount of Longmont's damages attributable to SBC's reporting of inflated costs, as

opposed to CMS's interpretation of the Medicare Act, promulgation and enforcement of Medicare payment regulations, and administration of the Medicare payment regime. Second, it may well be that there is an appreciable risk of duplicative recoveries here, *see Holmes*, 503 U.S. at 269, but even if there is not, our disposition remains unchanged, *see Anza*, 547 U.S. at 459 (finding no proximate causation "[n]otwithstanding the lack of any appreciable risk of duplicative recoveries . . ."). Third, although Longmont disputes whether the government was a more direct victim of SBC's alleged fraud, it cannot deny that the government was a direct victim. Here, the government has already "vindicated the laws by pursuing [its] own claims," *id.* at 460, and entering into a $265 million settlement with SBC on June 15, 2006.

At best, Longmont suffered harms indirectly related to SBC's alleged "turbocharging." Any impact that SBC's conduct had on Longmont hinges entirely upon CMS's administration of the Medicare reimbursement system. Since "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly," *id.* at 460, we will affirm the District Court's decision to grant SBC's motion to dismiss.